GRIESINGER, TIGHE & MAFFEI, LLP          Hearing Date:  May 3, 2012
176 Federal Street                       Hearing Time:  10:00 a.m.
Boston, MA 02110
(617) 542-9900
Ann Pauly

TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, NY 10018
(212) 216-8000
Scott S. Markowitz, Esq.

Counsel for Charles R. Lawson

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

In re:                                          Chapter 7

ANDREW D. JUBELT,                               Case No. 09-15435 (SMB)
                    Debtor.


-------------------------------------------------------------X


CHARLES R. LAWSON, as he is
TRUSTEE OF TRUST 55547-90,                      Adversary Proceeding
TRUST 12572-90 and TRUST 9932-90,               Case No.09-01498

                    Plaintiff,

v.

ANDREW D. JUBELT,

                    Defendant.

-------------------------------------------------------------X


## MEMORANDUM IN SUPPORT OF
## MOTION OF PLAINTIFF LAWSON FOR SUMMARY JUDMENT ON COMPLAINT
## OBJECTING TO DISCHARGEABILITY OF DEBT

## INTRODUCTION

In his Adversary Complaint, plaintiff Charles Lawson ("Plaintiff" or "Lawson"), in his capacity as Trustee of Trust 55547-90, Trust 12572-90 and Trust 9932-90 (collectively, the "Trusts") seeks a determination by this Court that defendant Andrew D. Jubelt ("Defendant" or "Jubelt")'s debt to Lawson and the Trusts (the "Debt") is non-dischargeable pursuant to §§ 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code. The Debt arises from an action prosecuted to final judgment in the Massachusetts Superior Court entitled *Charles R. Lawson, as Trustee v. Affirmative Equities Company, L.P., Affirmative Equities, Inc., Patrick Henry Hotel Associates, L.P., Patrick Henry Hotel Investments Associates, Andrew D. Jubelt, Lawrence Bishop and John Hrvatin*, Civil Action No. MICV2002-04554-D (the "Massachusetts Lawsuit"). In the Massachusetts Lawsuit, Lawson sought redress for losses to the Trusts arising from guarantees for a loan that Jubelt, in 1993, fraudulently solicited from Lawson and the Trusts. Final judgment entered in favor of Lawson in the Massachusetts Lawsuit, including judgment against Jubelt on Lawson's claims of intentional fraud and breach of fiduciary duty.

As shown below, the collateral estoppel doctrine applies here, and the findings by the Massachusetts court that Jubelt committed fraud and breached his fiduciary duty to Lawson and the Trusts requires entry of judgment in favor of Lawson on his Adversary Complaint.

## BACKGROUND

### A.    Background to Entry of Judgment Against Jubelt in the Massachusetts Courts.

Mr. Lawson commenced the Massachusetts Lawsuit in October of 2002 against Jubelt, and against Affirmative Equities, Inc. ("AEI"), Affirmative Equities Company, L.P. ("AEC"), Patrick Henry Hotel Associates, L.P. ("PHHA") and Patrick Henry Hotel Investment Associates ("PHHIA") (collectively, the "AEC/PHHALP Entities"), entities which were controlled by

Jubelt.  (See *Affidavit of Ann Pauly, Esq.* ("Pauly Aff."), Exhibit ("Ex.") A:  pages 1, 11 of 28 ("pp. 1, 11/28").

The initial defendants in the Massachusetts Lawsuit (improperly) removed the action to the federal court, asserting diversity of citizenship.  (Pauly Aff., Ex. A, p. 11, Dkt #10).  On or about May 26, 2006, when it was determined that diversity did not exist, and that the federal court never had subject matter jurisdiction over the action, the case was remanded to the state court.  (Pauly Aff., Ex. B, Dkt. #129).  Shortly after the remand, Lawson filed his *Third Amended and Supplemental Complaint* (the "Massachusetts Complaint"), the operative complaint in the Massachusetts Lawsuit.  (A copy of the Massachusetts Complaint is appended to the Pauly Aff. as Ex. E).  Jubelt, and his co-defendants, filed an answer to the Massachusetts Complaint.  (See Pauly Aff., Ex. F).

Discovery in the Massachusetts Lawsuit, conducted mostly under the federal rules, was extensive, and included document requests, interrogatories, depositions and requests for admission.  (See Pauly Aff., Ex. G, passim; Ex. I, pp. 1-30, passim.  Lawson's repeated attempts to resolve a dispute over the patent inadequacy of responses to interrogatories, directed to AEC but largely focused on obtaining critical evidence supporting Jubelt's individual and personal liability (information which Lawson had been unable to elicit through depositions), proved fruitless.  Accordingly, pursuant to Mass. R. Civ. P. 37(a), Lawson filed a Motion to Compel.  (See Pauly Aff., Ex. A:  p. 14/28, Dkt. # 22; Ex. G:  Ex. 2 thereto).  After hearing, on November 2, 2006, the Massachusetts court entered an order allowing Lawson's Motion to Compel (the "November 2006 Court Order"), and providing Jubelt with six weeks to supplement the interrogatory responses.  (See Pauly Aff., Ex. G:  Ex. 1 thereto).

The "supplement" to the disputed interrogatory responses that Jubelt finally provided, however, did not provide any additional meaningful substantive information and pressed new spurious objections.  It was patently deficient and willfully violated the November 2, 2006 Court Order in bad faith.  (See, e.g., Pauly Aff., Ex. G:  Ex. 5 thereto, a chalk which provides a brief summary and comparison of the various iterations of the interrogatory responses and purportedly supplemented responses to the interrogatories in question).

Accordingly, Lawson requested that the Massachusetts court impose sanctions on Jubelt for his abuse of the discovery process and violation of the November 2006 Court Order.  Lawson filed a Motion to Impose Sanctions on Jubelt, as the controlling person and agent of AEC (as well as on AEC and the CFO of AEC, John Hrvatin, a co-defendant in the Massachusetts Lawsuit)[1].  (See Pauly Aff., Ex. G).

After a hearing, the Massachusetts court entered an Order, dated May 15, 2007, which, in large part, allowed Lawson's Motion to Impose Sanctions. (See, Pauly Aff., Ex. H: the "May 2007 Sanctions Order").  As the May 2007 Sanctions Order reflects, the Massachusetts court declined to enter, as a sanction, the default judgment against Jubelt, that Lawson had requested.  Instead, the Massachusetts court imposed a lesser alternative, and ordered stricken Jubelt's denial of a list of those specific paragraphs in the Massachusetts Complaint which contain the allegations to which the interrogatories at issue were directed, and ordered those listed paragraphs be deemed admitted.  (See id.).  The sanctions imposed by the Massachusetts court thus were carefully crafted to redress the particular discovery abuse that Jubelt had perpetuated,

---

[1]   A corporation can act only through a natural person, through its officers, directors and agents.  E.g., SEC v. Ballesteros Franco, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003).  "[T]he knowledge of a general partner can be imputed to a limited partnership."  Picard v. Chais (In re Madoff),  445 B.R. 206, 224 (Bankr. S.D.N.Y. 2011).

and to prevent Jubelt from benefiting from his abject refusal to provide discovery, and from his refusal to comply with the November 2006 Court Order.

Over two months later, Jubelt, (and AEC and Hrvatin), filed untimely motions for reconsideration of the May 2007 Sanctions Order, which the court denied. (See, Pauly Aff., Ex. A: pp. 16-17/28). Mr. Jubelt (and AEC and Hrvatin) subsequently filed Petitions for Interlocutory Relief with the Massachusetts Appeals Court, which, on or about January 10, 2008, were also denied,. (See Pauly Aff., Ex. C).

Notably, throughout this lengthy motion practice, and the subsequent continued litigation, Jubelt made no effort to cure his failure to provide discovery, or to provide the information that he was appropriately sanctioned for withholding. (See Pauly Aff., Ex. A: pp. 16-28/28 passim).

Rather, Jubelt (and the other parties) continued to prepare for a trial of the Massachusetts Lawsuit, and to litigate the case. (See, e.g., id., pp. 16-21/28, passim). On about February 25, 2008, the Massachusetts court entered partial judgment in the Massachusetts Lawsuit against the AEC/PHHALP Entities on the Trusts' breach of contract claim only, which became a final judgment ripe for execution. (See id., pp. 18-19/28, Dkt. #53). A trial in the Massachusetts Lawsuit against Jubelt and Hrvatin on all counts, and against AEC on the remaining counts, was scheduled to commence in January of 2009. (Id., p. 10/28). The trial against the other defendants was severed. (Id., p. 17/28, Dkt. #48).

Then, on about December 2, 2008, Jubelt filed voluntary petitions in bankruptcy on behalf of each of the four AEC/PHHALP Entities in this Court. As a result, the Massachusetts Lawsuit, as against the AEC/PHHALP Entities, was automatically stayed. (Id., pp. 21-22/28, Dkt. #68). The trial in the Massachusetts Lawsuit as against Jubelt and Hrvatin was rescheduled to May 4, 2009. (Id., p.10/28).

On Friday, May 1, 2009, however, Jubelt filed his personal petition in bankruptcy under Chapter 11, in the Eastern District of Pennsylvania. (See Pauly Aff., Ex. M, #56). Upon notice that Jubelt had filed in bankruptcy, the trial in the Massachusetts court was once again continued, to September 28, 2009. (See Pauly Aff., Ex. A: p. 10/28). Lawson successfully moved to transfer venue of Jubelt's bankruptcy case to this Court. (See Pauly Aff., Ex. M, #56). On about September 22, 2009, Lawson filed a *Motion for Relief From Stay Pursuant to §362(d)(1) to Permit Continuation of Trial Against Debtor in Massachusetts State Court* ("Motion for Relief From Stay"). Several days later, Lawson timely filed his Adversary Complaint. (See Pauly Aff., Ex. M, #63).

During the hearing on Lawson's Motion for Relief From Stay, the parties acknowledged that, under the doctrine of collateral estoppel, a final judgment and findings regarding Lawson's claims against Jubelt, in the Massachusetts Lawsuit, would likely dictate the outcome of Lawson's similar claims in the Adversary Proceeding. Jubelt and his counsel were present at the hearing, and were provided with an opportunity to speak. (See id., #72). This Court thereafter entered an *Order Granting Creditor Lawson's Motion For Relief From Stay*, and stayed this Adversary Proceeding pending entry of final judgment in the Massachusetts Lawsuit**.** (Id.)

With the automatic stay lifted, the Massachusetts Lawsuit proceeded as against Jubelt and, represented by his Massachusetts counsel, Jubelt continued to pursue his defense of the claims alleged against him. A trial on Lawson's claims against Jubelt and Hrvatin, was rescheduled to February 22, 2010. (Pauly Aff., Ex. A: pp. 22-23/28). At a final pre-trial conference, the Massachusetts trial court addressed and decided trial issues such as motions in limine, objections to proposed exhibits and to the deposition testimony designated by the parties,

and procedural matters.  (Id. at p. 23/28, Dkt. #80).  During the discussion, the impact of the May 2007 Sanctions Order on the trial proceedings was raised.

On about February 12, 2010, after a conference with counsel for Jubelt, Hrvatin and Lawson, the Massachusetts trial court entered a Procedural Order in which it cancelled the February 22, 2010 trial date, and established a schedule requiring Lawson, Jubelt, and Hrvatin to file and serve proposed findings of fact and conclusions of law pertaining to the claims against those defendants.  (Pauly Aff., Ex. A, p. 23/28, Dkt. #81).  Accordingly, Lawson filed his Proposed Findings of Fact and Conclusions of Law on February 22, 2010 ("Lawson's Proposed Findings"), and Jubelt filed his Proposed Findings of Fact and Conclusions of Law on March 2, 2010 ("Jubelt's Proposed Findings").  (Pauly Aff., Exs. I and J respectively).

To support Lawson's Proposed Findings, Lawson provided the Massachusetts court with references not only the admissions in the Massachusetts Lawsuit, but also to supporting materials from discovery in the case.  (See Pauly Aff., Ex. I).

In contrast, Jubelt affirmatively chose to limit his proposed findings of fact to admissions only, and requested that the Massachusetts court do the same, in a court order that would specifically provide, in relevant part:

> Based solely upon the allegations that have been admitted by defendants Andrew Jubelt and John Hrvatin . . . in their *Answer to the Third Amended and Supplemental Complaint* . . . and in responses to Requests for Admissions made pursuant to Rule 36, Mass. R. Civ. P. by Andrew Jubelt and the entity defendants (but not John Hrvatin), and the allegations of the Complaint which the defendants Jubelt and Hrvatin are deemed to have admitted by the  . . . May 2007 Sanctions Order, . . . the Court finds and rules as follows: . . .

See Pauly Aff., Ex J: Ex. A thereto, p. [1].

Lawson objected to Jubelt's insistence that the Massachusetts trial court, in drafting its factual findings, limit its citations to the admissions.  (See Pauly Aff., Ex. K: p. 2).

The Massachusetts trial court, however, acceded to Jubelt's request, and entered a *Memorandum of Decision and Order for Judgment* (the "MA Findings") on August 27, 2010, in which the Massachusetts court, in its Findings of Fact relies solely on the admissions. (A copy of the MA Findings, is appended hereto, for the Court's convenience, as <u>Attachment A</u>. <u>See also</u>, Pauly Aff., <u>Ex. L</u>: which includes copies of the MA Findings, the *Stipulation of Defendants Andrew D. Jubelt and John Hrvatin* (regarding Lawson's claim under Mass. G.L. c. 93A), and the *Final Judgment on Claims Against Defendants Andrew D. Jubelt and John Hrvatin* (the "Judgment") (collectively, the "Massachusetts Judgment and Findings").

Jubelt and Hrvatin filed notices of appeal from the Judgment. (Pauly Aff., <u>Ex. A</u>: p. 27/28; Dkt. #104). Hrvatin subsequently entered into a settlement agreement with Lawson and dismissed his appeal. (<u>See</u> Pauly Aff., <u>Ex. D</u>: Dkt. #9) Jubelt failed to pursue his appeal. After providing Jubelt with several extensions of time, the Massachusetts Appeals Court finally dismissed Jubelt's appeal for lack of prosecution. (<u>See</u> Pauly Aff., <u>Ex. D</u>). Accordingly, the Massachusetts Judgment is no longer subject to appeal.

Having asked the Massachusetts court to make its findings of fact based solely on the admissions in the Massachusetts Lawsuit, and then failing to prosecute his appeal of the Massachusetts Judgment and Findings - - -and having failed to make any effort to cure the discovery misconduct that led to the May 2007 Sanctions Order - -  Jubelt cannot now reasonably contend that he was not provided with a fair opportunity to litigate his defense of the claims against him in the Massachusetts Lawsuit.

**B.**     <u>**The Undisputed Facts Established By the Massachusetts Judgment and Findings Relevant to Lawson's Claims for Nondischargeability.**</u>[2]

---

[2]  <u>See also</u>, *Plaintiff's Statement of Material Undisputed Facts as to Which There is No Genuine Issue to be Tried.*

During all times relevant to this matter, Jubelt was the president and a director of AEI, a New York corporation which is the general partner of AEC, a Delaware limited partnership. (MA Findings, ¶¶ 2, 3, 6).   Jubelt owns 75 percent of the shares of AEI, and is its controlling shareholder. (MA Findings, ¶ 6).   AEC is the general partner of PHHIA, a New York general partnership, which is the general partner of PHHA, a Delaware partnership.  (MA Findings, ¶¶ 2, 3, 6).  Patrick Henry Hotel Investors, Inc. is the managing partner of PHHIA.  (MA Findings, ¶ 5).  Jubelt is the president and a director of Patrick Henry [Hotel] Investors, Inc.  (MA Findings, ¶ 6).  AEC is the sole shareholder of Patrick Henry Hotel Investors, Inc.  (MA Findings, ¶ 2). Jubelt made decisions for PHHA regarding loans and financing.  (MA Findings ¶ 5).

The events which form the basis of both the Massachusetts Lawsuit and the Adversary Complaint began almost 26 years ago.  On or about May 8, 1986, Patrick Henry Investors, Ltd. entered into an Option Agreement with The Monterey Corporation ("Monterey") to purchase The Patrick Henry Hotel property in Roanoke, Virginia for $3.2 million.  Jubelt was the general partner of Patrick Henry Investors, Ltd.  (MA Findings ¶ 9).  When Jubelt delayed the closing date for the purchase, Monterey initiated a lawsuit to enforce the sale, alleging that if the sale were not completed, and Monterey had to sell The Patrick Henry Hotel to someone else, then Monterey would suffer losses in excess of $2 million.  (MA Findings ¶ 9).  The sale was completed in May of 1990, when Patrick Henry Hotel Investors, Inc. purchased The Patrick Henry Hotel property from Monterey.  (MA Findings ¶ 10).

As part of the sale, Patrick Henry Hotel Investors, Inc. delivered a two-year "purchase money note" in the amount of $1.1 million to Monterey, and assumed a first mortgage in the principal amount of $1.6 million that was held by Dominion Bank, N.A. ("Dominion") and guaranteed by the U.S Department of Housing and Urban Development ("HUD").  (MA

Findings ¶ 10).  The remainder of the purchase price was paid for in cash. (MA Findings ¶ 10).

Lawrence A. Bishop ("Bishop"), who was a director of AEI, and a close personal friend and business colleague of Jubelt's, provided a loan commitment letter to Jubelt and Patrick Henry Hotel Investors, Inc. (MA Findings ¶¶ 7, 11).  Bishop was employed by an investment advisory firm named Gray, Seifert & Co. ("Gray Seifert"), which was acquired by Legg Mason, Inc. ("Legg Mason") in about 1994. (MA Findings ¶ 7).   Bishop acted as an agent for, and for the benefit of the AEC/PHHALP Entities and Jubelt.  (MA Findings ¶ 7).

The Patrick Henry Hotel property was transferred to PHHA in December of 1990.  (MA Findings ¶ 11).  PHHA soon failed to make timely payments, and the Dominion loan and mortgage were assigned to HUD.  Monterey notified PHHA and AEC of Monterey's intent to commence foreclosure proceedings.  (MA Findings ¶ 12).  Jubelt and the AEC/PHHALP Entities searched for new financing for The Patrick Henry Hotel property.

Early in 1993, PHHA sought and obtained a letter of credit from the Republic National Bank of New York, now known as HSBC Bank USA ("HSBC"), in the amount of $2,500,000.00 (the "Letter of Credit"), to secure a loan (the "Loan") that they were seeking from the Union Bank of Switzerland ("UBS").  (MA Findings ¶ 13).   As a condition for issuing the Letter of Credit, HSBC required a guarantee for payment of amounts due under the Letter of Credit by an unaffiliated person and the pledging of assets to secure the guarantee.  (MA Findings ¶ 13).

Jubelt contacted Lawson and asked that the Trusts provide a guaranty in favor of HSBC that would guarantee the payment of the amounts due under the Letter of Credit and pledge assets to secure that guaranty, in exchange for a monthly fee.  (MA Findings ¶ 14).  Jubelt and Bishop (his agent) represented to Lawson during numerous conversations, *inter alia,* that the Letter of Credit and the guarantees would be in force for only a few months, that they would

refinance the financial obligations that underlay the Letter of Credit and guarantees within a few months, that the Trusts' obligations arising from guaranteeing the Letter of Credit would be secured by The Patrick Henry Hotel property and by the assets and projects of AEC and its affiliates, that AEC had sufficient financial assets to satisfy the obligations under the Letter of Credit, that PHHA at all times would maintain an escrow account at HSBC with a balance sufficient to pay three months interest due to HSBC, and that there was no risk and no potential for any loss to the Trusts in providing the requested guarantees. (MA Findings ¶ 15). Jubelt also represented to Lawson that the funds from the Loan would be used to pay for extensive renovations and improvements to The Patrick Henry Hotel property. (MA Findings ¶¶ 7, 15).

At the time that Jubelt made these representations, however, he knew them to be false. Jubelt knew, but fraudulently concealed from Lawson, that: (1) he had no intention of securing the Letter of Credit or the Trusts' obligations under the guarantees with a mortgage on The Patrick Henry Hotel property; and (2) there was no likelihood that the financial obligations that underlay the Letter of Credit would be refinanced in the following few months, or even years, and that contrary to his representations to Lawson, there was a high risk that the Trusts would suffer a substantial loss from providing the guarantees to HSBC. (MA Findings ¶¶ 16, 17). Jubelt concealed from Lawson that Monterey had threatened to foreclose on its mortgage on The Patrick Henry Hotel property, and that the proceeds from the Loan would be used to repay existing debt on The Patrick Henry Hotel property and to make a substantial "distribution" to the limited partners of PHHA, and not to renovate The Patrick Henry Hotel property. (MA Findings ¶ 17). PHHA was not paying its operating bills on time, and was effectively insolvent. (MA Findings ¶ 45, 47).

Jubelt also represented to Lawson that, to ensure that the Trusts were protected from any

loss arising from the guarantees to HSBC, he (Jubelt) (and AEI and AEC) would provide

Lawson and the Trusts with an Agreement of Guaranty that would guarantee the payment of any

and all sums drawn under the Letter of Credit (the "AEC Guaranty").  (MA Findings ¶ 18).

Jubelt knew that Lawson would rely on the AEC Guaranty and his representations concerning

the value and enforceability of the AEC Guaranty. (MA Findings ¶ 18).  At the time that Jubelt

made those representations, and delivered the AEC Guaranty to Lawson in 1993, Jubelt knew,

but fraudulently concealed from Lawson, that AEC and AEI and their affiliates did not have

available the cash or liquid assets that were necessary to satisfy their obligations under the AEC

Guaranty.  (MA Findings ¶ 18).  Rather, Jubelt and AEC relied on Bishop, and transfers from

Bishop's clients at Grey Seifert, to pay its operating expenses.  (MA Findings ¶¶ 21, 30).  AEC

also was effectively insolvent. (See id.)

Jubelt (and PHHA and Patrick Henry Hotel Investors, Inc.) provided a letter dated July

13, 1993 (the "July 13, 1993 Letter") to Lawson, confirming, *inter alia,* their agreement (l) to

pay each of the Trusts the sum of $6,000.00 upon issuance of the Letter of Credit; (2) to use their

best efforts to replace the financing underlying the Letter of Credit within six weeks; (3) to pay

each Trust $25,000.00 upon the funding of the refinancing; and (4) in the event that the

refinancing was not completed on or before August 31, 1993, to pay each Trust, on the first day

of each month thereafter until the refinancing was completed, the sum of $2,000.00.  (MA

Findings ¶ 19).  At the time that the July 13, 1993 Letter was delivered to Lawson, Jubelt knew

that he had no basis for representing that a refinancing of the debt on The Patrick Henry Hotel

property could be completed by August 31, 1993, and concealed from Lawson that The Patrick

Henry Hotel, which they had never operated at a profit, would not be able to pay the Trusts

$6,000.00 each month.  (MA Findings ¶ 19).

12

Kept in the dark, and justifiably relying on Jubelt's (false) representations, Lawson, on behalf of the Trusts, agreed to provide the requested guarantee, and Lawson executed a Guaranty and Security Agreement on behalf of each of the three Trusts in favor of Republic National Bank of New York for the benefit of PHHA.  (MA Findings ¶ 20).

At or shortly after the closing on the Loan and Letter of Credit, unbeknownst to Lawson, Jubelt instructed that, from the Loan proceeds, $250,000.00 be transferred to an affiliate of AEC, AEI and Jubelt named AEC Hanover Limited Partnership II; $620,000.00 be used to satisfy the purchase money note to Monterey; $317,500.00 be used to pay back a loan from a friend of his named George Egan; $63,400.00 be transferred to Michael Murphy [an AEC employee]; $33,500.00 be transferred to himself (Jubelt); $650,000.00 be transferred to AEC; $82,500.00 be transferred to the PHHA's limited partner Circle Northeast Realty Limited Partnership; $184,307.23 in "management fees" be transferred to AEC, and $450,000.00 to be transferred to Bishop's clients and to his friends.  (MA Findings ¶ 21). [3]  Jubelt concealed the transfers from Lawson. (MA Findings ¶ 22).

Jubelt (and Hrvatin and PHHA) purported to make a few monthly payments of the fees owed to the Trusts, by sending those checks to Bishop.  Then, after telling Lawson that PHHA and PHHIA did not have sufficient income to pay the monthly fees owed to the Trusts, they stopped paying the fees.  (MA Findings ¶ 22).

During the following years, 1994 through 2001, Jubelt (and AEC, AEI and Hrvatin) continued to represent to Lawson that AEC and AEI had sufficient financial assets available to them to satisfy the obligations under the AEC Guaranty and that the Letter of Credit would be

---

[3]  Bishop had previously transferred funds from his clients' accounts to AEC, apparently without obtaining any loan documentation and without requiring that any interest be paid to the clients for the use of their money. (MA Findings ¶ 21).

paid in full, and that a sale of The Patrick Henry Hotel was imminent, at which time the Letter of

Credit, converted into the Demand Note,[4] would be paid in full, as would the monthly payments

in arrearage due to the Trusts, knowing that Lawson would rely on those representations, when

Jubelt knew that those representations were untrue.  (MA Findings ¶¶ 24, 29).  Meanwhile,

Jubelt knew, but fraudulently concealed from Lawson, that  PHHA was unable to pay its

operating expenses without obtaining funds from outside sources; that after HUD had taken steps

on several occasions to foreclose on its mortgage, he had refinanced the HUD loan with a loan

from Titan Management, L.P. ("Titan") secured by The Patrick Henry Hotel property; that Titan

had also threatened foreclosure; and that AEC did not have the cash or access to the liquid assets

necessary to satisfy the obligations under the AEC Guaranty.  (MA Findings ¶¶ 26, 28, 31).

Jubelt knew, but fraudulently concealed from Lawson, that the AEC/PHHALP Entities

were insolvent.  (MA Findings ¶ 30).  Jubelt (and Hrvatin) continued their practice of asking

Bishop to provide AEC with "investment" money from clients of Gray Seifert, so that they

(Jubelt and Hrvatin) could use those funds to pay themselves salaries and benefits totaling

hundreds of thousands of dollars a year.  Bishop then directed the transfer of client funds to

AEC, PHHA and their affiliates.  (MA Findings ¶ 30).

Jubelt continued to represent to Lawson that the Letter of Credit, and Demand

Note, and the Trusts' obligations under the Trust HSBC Guarantees, had been secured by

The Patrick Henry Hotel, as well as the assets and projects of AEC and its affiliates (when

in fact he knew they had not); that the Demand Note would be fully satisfied when The

Patrick Henry Hotel was sold, and that Lawson and the Trusts were fully protected from

---

[4]   In July 1997, HSBC converted the Letter of Credit into a demand note in the amount of $2,500,000 and repaid the
funds due to UBS, but did not void or discharge the Trust HSBC Guarantees.  (MA Findings ¶ 27).  The Demand
Note provides, in relevant part, that "This Note shall be payable in lawful money of the United States of America in
immediately available funds." (MA Findings ¶ 27).

any loss by the AEC Guaranty.  (MA Findings ¶¶ 31, 32).  Those representations, as

Jubelt knew, were untrue.  (MA Findings ¶ 32).  Jubelt had never caused or intended to

cause, the Demand Note to HSBC or the Trusts' obligations under the Trust HSBC

Guarantees to be secured by either AEC and its affiliates' assets and projects or by The

Patrick Henry Hotel property as he represented had been done.  (MA Findings ¶ 42).

Instead, Jubelt placed millions of dollars of other debt on The Patrick Henry Hotel  which

he secured with mortgages on The Patrick Henry Hotel property, a substantial amount of

that secured debt designated to be paid to himself (Jubelt) or his affiliates, and which

would be paid (with interest) at the sale of The Patrick Henry Hotel.  (MA Findings ¶ 42).

At least one of those additional loans was in default.  (MA Findings ¶ 33).

    In about April or May of 2001, Bishop contacted Lawson and told Lawson that The

Patrick Henry Hotel was about to be sold, but that PHHA needed funds to complete the sale.

(MA Findings ¶ 34).  Contrary to Bishop's representations to Lawson, the funds that Jubelt and

Bishop were soliciting were not intended to be used to complete the sale of The Patrick Henry

Hotel.  (MA Findings ¶ 34).  Rather, the funds were intended to pay, and were used to pay, the

operating expenses of AEC, including Jubelt's salary.  (MA Findings ¶ 34).  No sale of The

Patrick Henry Hotel had been scheduled.  (MA Findings ¶ 34).

    From time to time, PHHA's monthly interest payments to HSBC were late.

(MA Findings ¶ 36). On or about November 30, 2001, HSBC sent Jubelt (and AEC and PHHA)

a letter demanding payment in full of the principal and all interest due under the Demand Note to

which the Trust HSBC Guarantees apply.  (MA Findings ¶ 37).  When Lawson became aware of

the HSBC demand, and that Jubelt did not intend to comply with HSBC's demand and satisfy

the obligations under the Demand Note, Lawson sent a letter invoking his rights under the AEC

Guaranty. (MA Findings ¶ 37). Lawson also sent a letter to Jubelt requesting written confirmation that the Demand Note and all accrued interest and fees related to the Demand Note would be paid in full no later than the date of the sale of The Patrick Henry Hotel, which at that time Jubelt represented would take place by February 28, 2002. (MA Findings ¶ 39). Jubelt after consulting with Bishop and Hrvatin, and the attorneys for the AEC/PHHALP Entities, decided not to respond to Lawson's December 3 letter. (MA Findings ¶ 39). Jubelt knew, but did not advise Lawson, that under the terms of any proposed sale, there would not be sufficient proceeds to repay the Demand Note in full. (MA Findings, ¶ 39).

In 2002, Jubelt finally informed Lawson that he did not intend to satisfy the Demand Note when The Patrick Henry Hotel was sold or in connection with any refinancing of the debt on The Patrick Henry Hotel property. (MA Findings ¶ 40). Jubelt stated that they would default on the Demand Note, knowing that HSBC would look to the Trust HSBC Guarantees and liquidate the Trusts' assets to collect the monies due under the Demand Note, thereby freeing him (and his businesses, the AEC/PHHALP Entities) from the debt that they owed to HSBC. (MA Findings ¶ 40). Jubelt also informed Lawson, that, instead of satisfying the obligations under the Demand Note, he intended to use proceeds from the sale of The Patrick Henry Hotel, or any refinancing of its debt, to make substantial payments to himself and to his affiliates for alleged services or debts grossly out of proportion to their actual value. (MA Findings ¶ 41). In addition, Jubelt intended to make a payment to AEC and AEI of at least one million dollars for promissory notes that they purchased from former debtors of the PHHA, most if not all of whom were clients of Bishop, or from Gray Seifert or Legg Mason, for less than twenty dollars ($20.00) in connection with settlements made by Gray Seifert and Legg Mason with their clients. (MA Findings ¶ 41).

Jubelt also informed Lawson, for the first time, that AEC was having difficulty meeting its day-to-day financial obligations, and that The Patrick Henry Hotel had been operating at a deficit for over ten years.  (MA Findings ¶ 47).  Jubelt gave Lawson a document which showed that of the funds expected upon the sale of The Patrick Henry Hotel, Jubelt had allocated only $1,203,918.00 toward repayment of the $2,500,000.00 due under the Demand Note.  (MA Findings ¶ 47).  Moreover, of that $1,203,918.00, only between $156,633.00 to $470,411.00 was to be paid in cash, with the remaining allocation purportedly to be paid in "residual" unrated bonds, which Jubelt knew HSBC would not accept in payment toward the monies owed under the Demand Note.  (MA Findings ¶ 47).

Jubelt stated that contrary to his representations over the years, neither the Letter of Credit, (later converted into a Demand Note), or the Trusts' obligations under the Trust HSBC Guarantees, had ever been secured by a mortgage on The Patrick Henry Hotel, and that now he was prohibited by law from securing them when he knew that was not true.  (MA Findings ¶ 47). Jubelt also informed Lawson that it was their position that the AEC Guaranty was unenforceable, and that, in their view, AEC (and AEI) has been stripped of any assets and sources of income, and made "judgment proof."  (MA Findings ¶ 48).

Jubelt is personally liable for the obligations to the Trusts set forth in the AEC Guaranty and for the losses suffered by Lawson and the Trusts.  (MA Findings ¶¶ 49, 50).  In conducting the business of the AEC/PHHALP Entities, and their affiliates, Jubelt dominated the activities of those entities, and failed to observe the necessary legal formalities required to protect himself from personal liability for the debts of, *inter alia,* PHHA, PHHIA, AEC and AEI.[5]  The

---

[5]   Jubelt failed to ensure that each of the corporate and partnership entities were adequately capitalized; intermingled personal and corporate or partnership funds and made so-called "intercompany loans", including "loans" to Jubelt personally, without documenting or obtaining any security for the so-called loans, or requiring that interest be paid on the loans or that the loans be repaid by a certain date; transferred the assets (including funds) of

corporate and partnership entities are all insolvent, and have been insolvent at relevant times.

(MA Findings ¶ 50).  Jubelt exercised pervasive control and dominion over the AEC/PHHALP

Entities, and their affiliates, and used those entities to defraud Lawson and the Trusts.  (MA

Findings ¶ 50).  Furthermore, as an officer of insolvent entities, Jubelt owed a fiduciary duty to

the Trusts as creditors of the AEC/PHHALP Entities.  (MA Findings ¶ 63).  Jubelt violated his

fiduciary duty to Lawson and the Trusts.  (MA Findings ¶ 63).

In January of 2006, when HSBC demanded payment from PHHA of the principal amount

due under the Demand Note, PHHA failed to pay HSBC the principal and interest due on the

Demand Note.  (MA Findings ¶ 53).  HSBC therefore exercised its rights under the Trust HSBC

Guarantees, and liquidated the Trusts' assets and withdrew a total of $2,506,661.81 from the

Trusts' custody accounts at HSBC.  (MA Findings ¶ 54).  Lawson sent a letter to Jubelt (and

AEC and AEI) pursuant to the AEC Guaranty; Jubelt refused to honor the obligations under the

AEC Guaranty.  (MA Findings ¶ 55).

There is no question but that Jubelt benefited both personally and commercially from the

Trust HSBC Guarantees, to the detriment of the Trusts.  (MA Findings ¶ 40).

In sum, Jubelt knew from 1993 through 2001, but fraudulently concealed from Lawson,

*inter alia,* that The Patrick Henry Hotel (PHHA's only asset) was insolvent, that AEC and AEI

did not have the cash or liquid assets necessary to satisfy the AEC Guaranty when it was

executed and delivered to Lawson, and that he would not repay the monies due under the

---

one entity to another at will and without documenting any reason for the transfer from the entities' bank accounts;
accepted funds from accounts of Gray Seifert clients for immediate transfer to Bishop's friends; used funds in the
bank account of one entity to pay the debts of another entity; paid the personal expenses of Bishop, Hrvatin and
Jubelt; transferred funds to the personal bank accounts of Jubelt and to those of his family members without any
business reason for doing so; and repaid loans to insiders while not repaying loans to others or satisfying the
operating debts incurred by AEI, AEC, PHHA and PHHIA.  (MA Findings ¶ 50).  They all had the same office
headquarters, used the services of the same employees (who were paid only by AEC and did not keep track of how
much of their time was dedicated to performing services for the various affiliates or other entities, or on the personal
business or affairs of the individual [Massachusetts Lawsuit] defendants), and used the letterhead of AEC for all of
the entities.  (MA Findings ¶ 50).

Demand Note as promised and represented.  (MA Findings ¶ 45).  Lawson had had no access to

the books of account or financial records of PHHA, PHHIA, AEI, AEC, or their affiliates, and

had relied on the representations of Jubelt and his agents concerning the viability and financial

assets of AEC, AEI, PHHA and PHHIA, as Jubelt knew he would and did.  (MA Findings ¶ 47).

Jubelt acted to deceive and/or commit fraud upon Lawson and the Trusts.  (MA Findings

¶ 64, p. 132).  Jubelt fraudulently induced Lawson to provide the Trust HSBC Guarantees;

misrepresented that the Letter of Credit (and later Demand Note) would be satisfied when the

debt on The Patrick Henry Hotel was refinanced; misrepresented initially that the Letter of

Credit and/or the Trusts' obligations under the Trust HSBC Guarantees had been secured by The

Patrick Henry Hotel and later when, late in 2001, Lawson learned it had not been secured, told

Lawson that the law prohibited him from securing the Demand Note (which had replaced the

Letter of Credit) and/or the Trusts' obligations under the Trust HSBC Guarantees with a

mortgage on The Patrick Henry Hotel; misrepresented that The Patrick Henry Hotel was actively

being marketed for sale, and that a sale was imminent when that was not true; misrepresented

that AEC had sufficient assets to reimburse the Trusts for any funds that HSBC might liquidate

and withdraw from the Trusts' accounts should HSBC exercise its rights under the Trust HSBC

Guarantees when that was not true; misrepresented that there was no risk to the Trusts' assets in

providing the Trust HSBC Guarantees when that was not true; misrepresented that PHHA would

pay each of the Trusts $2,000.00 per month when he knew that PHHA was operating at a deficit

and that he had distributed almost all of the $2.5 million that they received from the Loan within

two months of receiving the proceeds from that Loan, some of which was distributed to himself

and his associates or friends; concealed that he was diverting assets and business opportunities to

other entities in an effort to make AEC, AEI, PHHA and PHHIA "judgment proof" in the event

that Lawson and Trusts exercised their rights under the July 13, 1993 Letter or the AEC

Guaranty, and concealed that he was diverting substantial funds to himself (and others) while at

the same time AEC, AEI, PHHA and/or PHHIA were insolvent.  (MA Findings ¶ 64).

## DISCUSSION

### A.    The Legal Standard.

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to this proceeding by

Bankruptcy Rule 7056, a "court should grant summary judgment if the movant shows there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Once the movant satisfies his initial burden of showing that the undisputed facts entitle

him to summary judgment as a matter of law, then the burden shifts to the nonmoving party, who

must set forth specific facts showing that there is a genuine issue for trial to avoid entry of

summary judgment against him. Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574,

586 (1986).  The preponderance of evidence standard applies to all exceptions from

dischargeability of debt set forth in § 523(a), including nondischargeability for fraud.  Grogan v.

Garner, 498 U.S. 279, 290 (1991).  As shown below, Lawson has satisfied his burden, and

summary judgment should enter in favor of Lawson and the Trusts on the Adversary Complaint.

### B.    The Doctrine of Collateral Estoppel Applies to This Case.

It is established that the doctrine of collateral estoppel applies to nondischargeability

actions under 11 U.S.C. § 523(a).  Grogan, 498 U.S. at 284 n. 11.  When, as here, collateral

estoppel is asserted in the federal court, on the basis of a state court judgment, the federal court

must look to the law of the state in which the judgment was entered to determine if the state

court judgment would have preclusive effect in that state.  E.g.,  In re Bursack, 65 F.3d 51, 53

(6th Cir. 1995).  Accordingly, this Court must look to the law of the Commonwealth of Massachusetts to assess the preclusive effect of the Massachusetts Judgment and Findings.

**C.**     **The Massachusetts Judgment and Findings Would Have Preclusive Effect in Massachusetts, and Thus Have Preclusive Effect in This Court.**

It is beyond dispute that Jubelt "substantially participated" in the Massachusetts Lawsuit over a period of about <u>nine years</u>, answering the Massachusetts Complaint, engaging in widespread discovery (including propounding and/or responding to document requests, interrogatories, requests for admissions and depositions), filing motions (and oppositions to motions) with the Massachusetts courts and, importantly, providing, to the court, detailed requests for findings of fact and conclusions of law for adoption in the Massachusetts Judgment and Findings.  (<u>See</u> Pauly Aff., <u>Exs. A, B, G, I.</u>) Under these circumstances, the Massachusetts courts would apply collateral estoppel to the Massachusetts Judgment and Findings.

The recent decision in <u>Backlund v. Stanley-Snow (In re Stanley-Snow)</u>, 405 B.R. 11 (B.A.P. 1st Cir. 2009), is directly on point.  In <u>Backlund</u>, the United States Bankruptcy Appellate Panel for the First Circuit addressed a claim that a Massachusetts state court judgment in favor of the plaintiff was nondischargeable pursuant to § 523(a)(2)(A), in a case which presented facts materially similar to the facts in this case.  The defendant debtor argued that the bankruptcy court should not have given the prior Massachusetts state court judgment collateral estoppel effect, in an adversary proceeding to determine dischargeability, because it was a default judgment.  The <u>Backlund</u> court rejected the defendant's argument, and, applying Massachusetts law of collateral estoppel to the default judgment, affirmed entry by the bankruptcy court of summary judgment in favor of the plaintiff creditor.

Reviewing Massachusetts law of collateral estoppel, the <u>Backlund</u> court stated:

Under Massachusetts law, collateral estoppel precludes relitigation of issues in prior actions between the parties or those in privity with those parties, provided the issues were actually litigated in the first action, and determined by a "final judgment on the merits." Smith Barney, Inc. v. Strangie (In re Strangie), 192 F.3d 192, 194 (1st Cir. 1999).  To apply the doctrine, a court must determine that: (1) there was a valid and final judgment on the merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment.  Alba v. Raytheon Co.,  836, 809 N.E. 2d 516, 521 (Mass. 2004) (citations omitted).

Id. at 18.

Discussing the "actually litigated" and "final judgment on the merits" requirements, the Backlund court pointed to the decision of the Massachusetts Supreme Judicial Court in Treglia v. MacDonald, 430 Mass. 237, 717 N.E.2d 249 (1999), which "recognized that there are situations where, following a default judgment, an issue may be given preclusive effect in subsequent litigation between the same parties."  405 B.R. at 18.

In Treglia, the Massachusetts Supreme Judicial Court stated:

We can, for example, envision circumstances in which a litigant may so utilize our court system in pretrial procedures, but nonetheless be defaulted for some reason, that the principle and rationale behind collateral estoppel would apply. See, e.g., Matter of Gober,100 F.3d 1195 (5th Cir. 1996) (holding that default judgment based on failure to answer does not support issue preclusion but where default issued as discovery sanction against defendant debtor after two years of litigation in which defendant had answered and denied all allegations of complaint, collateral estoppel applied); In re Bush, 62 F.3d 1319, 1324 (11th Cir. 1995) (applying collateral estoppel effect to prior default judgment against debtor based on fraud, where debtor "actively participated"   in adversary process for almost one year through filing answer, counterclaim, and discovery requests).

Treglia, 717 N.E.2d at 254.[6]

---

[6]  The Backlund court also noted that most federal courts had "ruled that the 'actual litigation' requirement of collateral estoppel may be satisfied if the party actively or substantially participated in the proceedings prior to the entry of a default judgment".  405 B.R. at 20. (citations omitted). "These courts have reasoned that if a party was afforded a reasonable opportunity to defend in the prior action but chose not to do so, the party could have reasonably foreseen the consequences of not defending the action and it would be 'undeserved' to give a 'second bite at the apple when he knowingly chose not to defend himself in the first instance'."  (citations omitted)  Id.

The Backlund court found that the debtor defendant had substantially participated in the prior state court action, by extensively participating in the action for two years - - filing an answer to the complaint, participating in written discovery, giving a deposition and filing papers with the court -- before, without explanation, failing to appear for trial on the merits.  Therefore, the Backlund court ruled, the "actually litigated" requirement for collateral estoppel was satisfied under Massachusetts law.  Id. at 20.  The debtor defendant was precluded from challenging the findings and judgment entered by the Massachusetts trial court, and the debt to the plaintiff Backlund was nondischargeable.

The reasoning in Backlund applies squarely to Lawson's Adversary Proceeding, and this Court should likewise rule that collateral estoppel precludes Jubelt from relitigating the issues addressed in the Massachusetts Judgment and Findings, and in particular, the findings that Jubelt committed fraud and breached his fiduciary duty.

In addition to Backlund, the facts in Lawson's Adversary Proceeding present exactly the type of circumstances described by the Massachusetts Supreme Judicial Court in Treglia as warranting application of collateral estoppel.  In Treglia, Massachusetts Supreme Judicial Court cites two cases – each with facts materially similar to those in this case - - for the proposition that collateral estoppel should apply to default judgments where the litigant had substantially participated in the prior court action.

In the first case that the Treglia court cited, Gober v. Terra+Corp (In re Gober), 100 F.3d 1195 (5th Cir. 1996), the Fifth Circuit Court of Appeals affirmed the determinations, by the bankruptcy and district courts, that a state court default judgment entered as a sanction for discovery abuse was entitled to preclusive effect in a subsequent bankruptcy proceeding to determine dischargeability.  The bankruptcy court had found that the state court default judgment

established the elements of § 523 (a)(4) and (6), and that issue preclusion barred relitigation of

those issues.  Id. at 1200.  On appeal, the debtor argued (unsuccessfully) that the state court

judgment should not have been given preclusive effect because, he contended, the issues relevant

to a determination of dischargeability were not "actually litigated" since the state court had

struck his pleadings and deemed the plaintiff's material allegations against him admitted in that

action.  Id. at 1203.  The Fifth Circuit Court disagreed, observing that the parties had actively

litigated the underlying state court action (the defendant had answered the complaint, filed

counterclaims, made discovery requests); and that the state court had sanctioned the defendant

for discovery abuses and ordered the defendant's answer struck only after the defendant failed to

appear at a hearing on, *inter alia*, plaintiff's motion to strike his answer for failure to comply

with the court's sanction order.  Id. at 1200, 1205.  Accordingly, the Fifth Circuit Court ruled,

the claims in the state court action had been "actually litigated," and the state court judgment had

properly been given preclusive effect.

    Similarly, in the second case cited, Bush v. Balfour Beatty Bahamas, Ltd (In re Bush), 62

F.3d 1319 (11th Cir. 1995), the debtor argued, in an adversary proceeding to determine

dischargeability, that the bankruptcy court should not have given preclusive effect to a prior trial

court judgment because the issue of fraud had not been "actually litigated" in the prior action.

Id. at 1322.  In the prior action, the trial court had granted the plaintiff "judgment by default on

the grounds stated in the Complaint" after consideration of plaintiff's motion for sanctions.  The

defendant had filed an answer to the complaint and a counterclaim, putting the fraud allegations

at issue.  Id. at 1321.  Although the defendant had exchanged requests for documents and trial

exhibits, he then failed to appear for his deposition, failed to produce trial exhibits, and failed to

appear for a hearing on a motion for sanctions, which had been filed by the plaintiff pursuant to

Fed. R. Civ. P. 37(d), and for a pre-trial conference.  Id. at 1321.  On appeal, the Eleventh Circuit

Court found that the defendant had actively participated in the prior action over an extended

period of time, and had engaged in dilatory and deliberate misconduct which led to entry of a

default judgment against him on fraud claims as a sanction for discovery abuse.  Id. at 1324-25.

Affirming the lower court orders, the Eleventh Circuit Court stated:

> Just as due process is not offended by the entry of a default judgment against a party for
> failure to cooperate with discovery, . . . neither is due process offended if a debtor is held
> to the consequences of that judgment in a subsequent bankruptcy discharge proceeding.
> (citations omitted).

Id.

This Court, applying the reasoning in Backlund, Gober and Bush, should give preclusive

effect to the prior state court judgment in this case - - to the Massachusetts Judgment and

Findings - - and find the Debt to Lawson nondischargeable.  It is beyond dispute that Jubelt

actively participated in the Massachusetts Lawsuit over an extended period of nine years during

which Jubelt engaged in a strategy of delay and obfuscation.  Jubelt answered the Massachusetts

Complaint, engaged in extensive discovery, filed motions with the Massachusetts courts, and

filed and argued pretrial motions and issues.  The Massachusetts court entered the May 2007

Sanctions Order against Jubelt only after he refused to provide discovery probative, *inter alia*, to

his personal liability, and violated the November 2006 Court Order commanding him to provide

that discovery.  At no time did Jubelt make any effort to cure his abuse of the discovery process

that led to the sanctions order.  Significantly, Jubelt actively participated in proposing language

and supporting citations for the Massachusetts Judgment and Findings - - and asked the

Massachusetts court to base its Findings and Judgment only on his admissions, both those

voluntary made and those imposed as a sanction.

As the Gober and Bush decisions, and the cases referred to therein, instruct, moreover, a sanction which strikes a defendant's answer, and deems allegations in a complaint admitted, can provide the basis for a "final judgment on the merits", with the issues presented "actually litigated", and appropriately lead to issue preclusion in a subsequent bankruptcy proceeding to determine the dischargeability of the debt arising from the resulting judgment.

In short, the Massachusetts Judgment is a valid final judgment on the merits against Jubelt, the parties are the same, and the issues essential to the Massachusetts Judgment and Findings are identical to the issues raised in this Adversary Proceeding. As a matter of law, the issues were "actually litigated" as that term is used in determining the application of collateral estoppel. Accordingly, the requirements for collateral estoppel are satisfied, and this Court should give preclusive effect to the Massachusetts Judgment and Findings in this Adversary Proceeding.

**D.**    **The Massachusetts Judgment and Findings Sufficiently Support Lawson's Claim for Nondischargeability Pursuant to Section 523(a)(2)(A), the Fraud Exception.**

Section 523(a)(2)(A) provides an exception from discharge for "any debt . . . for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, false representations, or actual fraud." The exception can be proved by establishing only one of these three types of fraud. Indo-Med Commodities, Inc. v. Wisell (In re Wisell), 2011 Bankr. LEXIS 3112, *22 (Bankr. E.D.N.Y. Aug. 16, 2011) *citing* Gentry v. Kovler (In re Kovler), 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000). "The focus of Section 523(a)(2)(A)'s nondischargeability provisions must center on the harm caused to the creditor." Kovler, 249 B.R. at 260. The discharge provided by the Bankruptcy Code is limited to the "honest but unfortunate debtor", and does not extend to liabilities arising from fraud. Cohen v. De La Cruz, 523 U.S. 213, 217 (1998); Grogan, 498 U.S. at 286-287.

All of the elements necessary for a finding that the fraud exception to discharge applies in this case are established.  Guarantees (such as the Trust HSBC Guarantees) are "property" within the meaning of § 523(a)(2)(A).  E.g., USA v. Spicer (In re Spicer), 155 B.R. 795, 800 (Bankr. D.D.C.  1993).  As the bankruptcy court in Fraley v. McShirley (In re McShirley), 79 B.R. 71, 73 (Bankr. M.D. Fla. 1987) held, "when a debtor induces another to sign as a guarantor on an obligation, and the guarantor is ultimately held liable on the obligation and makes payment thereon, the debtor has obtained 'property' within the meaning of the § 523(a)(2)(A) exception to discharge."  The term "debt for" means "'debt as a result of,' 'debt with respect to,' 'debt by reason of', and the like."  Cohen, 523 U.S. at 220. (citations omitted).  The Debt for which Lawson seeks a determination of nondischarge in this Adversary Proceeding most certainly is a debt "as a result of", "with respect to" "by reason of" and the like.  It is a debt arising from Jubelt fraudulently inducing Lawson to agree to provide the Trust HSBC Guarantees. (See, e.g., MA Findings ¶¶ 15-16).

The fraud exception to discharge applies to all fraud claims that a creditor has successfully reduced to judgment, such as the Massachusetts Judgment obtained by Lawson. See, Grogan, 498 U.S. at 290.  Here, the Massachusetts Judgment and Findings establish the elements of all of the three types of fraud in § 523(a)(2)(A), i.e., "false pretenses", "false representations" and "actual fraud".

Addressing first "actual fraud", the most demanding type of fraud , to establish "actual fraud" within the meaning of § 523(a)(2)(A), a plaintiff must prove that: (1) the debtor made a false representation; (2) he knew the statement to be false; (3) the misrepresentation was made with an intent to deceive; (4) the plaintiff reasonably relied on the statement; and (5) the plaintiff sustained loss or damage as a result of the false statement.  E.g., Wisell, 2011 Bankr. LEXIS

3112, * 27. "Actual fraud" under section 523(a)(2)(A) is established when the underlying state

court has clearly found all the elements of fraud.  See, Grogan, 498 U.S. at 290.

Lawson pled a claim of intentional fraud in the Massachusetts Complaint. (See, Pauly

Aff., Ex. E:  pp. 30-31 and passim).  As in Bush, Jubelt filed an answer to the Massachusetts

Complaint, putting the fraud claim at issue. (See Pauly Aff., Ex. F).  The Massachusetts

Judgment and Findings explicitly found that Lawson had satisfied all of the elements of a claim

for intentional fraud under Massachusetts law, and entered judgment in favor of Lawson, and

against Jubelt, on the fraud claim.  (MA Findings p. 23; Judgment).  In doing so, the

Massachusetts court made findings which also satisfy the elements of a claim of "actual fraud"

under § 523(a)(2)(A).  The Massachusetts court found, inter alia, that (1) Jubelt had made false

statements to Lawson (MA Findings ¶¶  15-19, 45, 57, 64); (2) Jubelt knew the statements to be

false (MA Findings ¶¶ 15-19, 21-22, 45,57, 64); (3) with an intent to deceive (MA Findings ¶¶

17, 19, 21-22, 42, 57, 64, 65); (4 ) Lawson reasonably relied on the statements (MA Findings ¶¶

20, 57, 64); and (5) Lawson and the Trusts suffered damages as a result (MA Findings ¶¶ 53-55,

57, 64).  The Massachusetts court found that:

> Jubelt fraudulently induced Lawson to provide the Trust HSBC Guarantees;
> misrepresented that the Letter of Credit (and later Demand Note) would be satisfied when
> the debt on The Patrick Henry Hotel was refinanced; misrepresented initially that the
> Letter of Credit and/or the Trusts' obligations under the Trust HSBC Guarantees had been
> secured by The Patrick Henry Hotel and later when, late in 2001, Lawson learned it had
> not been secured, told Lawson that the law prohibited him from securing the Demand
> Note (which had replaced the Letter of Credit) and/or the Trusts' obligations under the
> Trust HSBC Guarantees with a mortgage on The Patrick Henry Hotel misrepresented that
> The Patrick Henry Hotel was actively being marketed for sale, and that a sale was
> imminent when that was not true; misrepresented that AEC had sufficient assets to
> reimburse the Trusts for any funds that HSBC might liquidate and withdraw from the
> Trusts' accounts should HSBC exercise its rights under the Trust HSBC Guarantees when
> that was not true; misrepresented that there was no risk to the Trusts' assets in providing
> the Trust HSBC Guarantees when that was not true; misrepresented that PHHA would
> pay each of the Trusts $2,000.00 per month when he knew that PHHA was operating at a
> deficit and that he had distributed almost all of the $2.5 million that they received from

the Loan within two months of receiving the proceeds from that Loan, some of which
was distributed to himself and his associates or friends; concealed that he was diverting
assets and business opportunities to other entities in an effort to make AEC, AEI, PHHA
and PHHIA "judgment proof" in the event that Lawson and Trusts exercised their rights
under the July 13, 1993 Letter or the AEC Guaranty, and concealed that he was diverting
substantial funds to himself (and others) while at the same time AEC, AEI, PHHA and/or
PHHIA were insolvent.  (MA Findings ¶ 64).

Accordingly, giving issue preclusion effect to the Massachusetts Judgment and Findings,

Lawson has established "actual fraud" under § 523(a)2)(A).

Moreover, in addition to "actual fraud", Lawson has also established "false pretenses", a

lesser standard than "actual fraud".  The "mischief" referred to by the term "false pretenses" has

been broadly construed by bankruptcy courts, and has been defined as "'implied representations

or conduct intended to create and foster a false impression". . . . A false pretense is established or

fostered willfully, knowingly and by design; it is not the result of inadvertence.'" <u>Kovler</u>, 249

B.R. at 261. (citations omitted).

"'False pretenses' for purposes of Section 523(a)(2)(A) then may be defined as conscious
deceptive or misleading conduct calculated to obtain, or deprive another of, property.  It
is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the
accomplishment of an unlawful objective.

<u>Id</u>.

The facts in this case, and established by the **MA Judgment and Findings**, support a

finding in this Court of "false pretenses" in satisfaction of § 523(a)(2)(A) as well.  As described

above, and found by the Massachusetts court, Jubelt knowingly and willfully engaged in unfair

and deceptive practices to obtain the Trust HSBC Guarantees --and was liable for intentional

fraud in the accomplishment of his objective, i.e., to obtain the guarantees.[7] (MA Findings ¶¶ 57,

64, 65, pp. 23, 26).

---

[7]   The Massachusetts court also found that Jubelt had engaged in civil conspiracy. ( MA Findings ¶ 64, p. 25.).
Debts that arise from the wrongful acts of conspirators and their co-conspirators are also nondischargeable under §

Finally, as to the third type of fraud, false representation, the elements of a false representation claim under § 523(a)(2)(A) are: " '(1) the defendant made a false or misleading statement (2) with intent to deceive (3) in order for the plaintiff to turn over money or property to the defendant'".  Wisell 2011 Bankr. LEXIS 3112, *25, *quoting* Frishberg v. Janac (In re Janac), 407 B.R. 540, 552 (Bankr. S.D.N.Y. 2009).  A false representation can be shown through a failure to disclose information or through an omission when under the circumstances presented, such disclosure is necessary to correct what  otherwise would be a false impression. Id.  The facts described above, and found by the Massachusetts court, also establish "false representations" within the meaning of § 523(a)(2)(A).  The Massachusetts court, for example, found that Jubelt had made false statements to Lawson to deceive Lawson so that Lawson would provide the Trust HSBC Guarantees.  (MA Findings ¶¶ 57, 64; p. 23).

Accordingly, as described above, Lawson has established all of the elements of a claim under § 523(a)(2)(A), and the Debt is nondischargeable under the fraud exception.

**E.      Lawson Has Also Established a Claim for Nondischargeability Under  Section 523(a)(4), the Fiduciary Exception.**

The MA Judgment and Findings also establish the elements of the fiduciary exception to discharge.  Section 523(a)(4) provides an exception to discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  To obtain relief relying on the doctrine of collateral estoppel under § 523(a)(4), Lawson must show that the Massachusetts Judgment and Findings established that (1) Jubelt committed fraud or defalcation, and (2) did so while acting in a fiduciary capacity.  See, e.g., Id., *29.  "The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a

---

523(a)(2)(A).  The Aetna Casualty and Surety Co. v. Markarian (In Re Markarian), 228 B.R. 34, 39 (Bankr. 1st Cir. 1998).

fiduciary capacity has been made." Andy Warhol Found. For Visual Arts, Inc. v. Hayes (In re Hayes), 183 F.3d 162, 170 (2d Cir. 1999) (citations omitted).

Whether a debtor is acting in a fiduciary capacity, initially, is a matter to be established under federal, not state, law. Zohlman v. Zoldan, 226 B.R. 767, 772 (Bankr. S.D.N.Y. 1998). Under federal law, a fiduciary relationship is to be defined narrowly, and generally exists as a result of a 'technical' or 'express' trust, and not an equitable trust. Zohlman, 226 B.R. at 773. To determine when a 'technical' or 'express' trust exists in an individual case however, federal courts look to state law. Id. at 773. "[C]ertain relationships not constituting actual trusts are within the defalcation exception." In re Hayes, 183 F.3d at 169. The fiduciary relationship must have existed prior to act that created the debt which is the subject of the nondischarge claim in order to satisfy § 523(a)(4). Zohlman, 226 B.R. at 772.

The "acting in a fiduciary capacity" element is satisfied here. Under New York law, when a corporation becomes insolvent, or enters the zone of insolvency, the officers and directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of the creditors. Booth Oil Site Administrative Group. v. Safety-Kleen Corp., 532 F. Supp. 2d 477, 517, 520 (W.D.N.Y. 2007); Hughes v. BCI International Holdings, Inc., 452 F. Supp 2d 290, 308 (2006); Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC), 316 B.R. 451, 460 (2004). When a corporation is in the vicinity of insolvency the directors owe a fiduciary duty to the entire community of interests, including creditors. In re Verestar, 343 B.R. 444, 471-72 (Bankr. S.D.N.Y. 2006). The fiduciary duty of an officer or director to creditors of an insolvent corporation creates a technical trust within the meaning of section 523(a)(2)(A). USA v. Bagel (In re Bagel), 1992 Bankr LEXIS 2501, at * 35.

The Massachusetts court found that, as an officer of insolvent entities, Jubelt owed a fiduciary duty to Lawson and the Trusts, and that he breached that duty. (MA Findings ¶ 63, p.25). Jubelt also breached his fiduciary duty as a director. "A corporation [or any entity, for that matter] is insolvent when it is unable to meet its obligations in the ordinary course of business". Wolstein v. Docteroff (In re Docteroff), 133 F.3d 210, 217 (3d Cir. 1997) (citations omitted). There is no question that PHHA was insolvent at the time Jubelt solicited the Trust HSBC Guarantees, made multiple false representations to Lawson and delivered the July 13, 1993 Letter. (MA Findings ¶¶ 12, 19, 45, 47).

Once a fiduciary relationship is established, the court must determine that the debtor committed "fraud or defalcation" while acting as a fiduciary. That standard is satisfied in this case. As shown above, Jubelt committed fraud in his solicitation of the Trust HSBC Guarantees, as well as in the years following his obtaining the guarantees.

The facts in this case also establish the alternative of "defalcation". In Denton v. Hyman (In re Hyman), 502 F.3d 61, 68 (2d Cir. 2007), the Second Circuit Court held that "defalcation under § 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context." (citations omitted). Scienter may be inferred from strong circumstantial evidence, or from proof that a defendant had motive and opportunity to commit fraud. SEC v. Ballesteros Franco, 253 F.Supp. 2d at 727 n.2. As the Massachusetts court found, Jubelt acted knowingly. The facts, and the events that transpired over the years following the solicitation and obtaining of the Trust HSBC Guarantees, support that conclusion. Quite clearly, Jubelt had both motive and opportunity to commit fraud. He needed to refinance the debt on The Patrick Henry Hotel property to avoid foreclosure, and he needed to repay the long list of loans that he had obtained in an effort to keep

The Patrick Henry Hotel afloat, despite its insolvency, and to repay the funds that Bishop had

transferred from his clients' accounts, to avoid detection of that very questionable conduct.

## **CONCLUSION**

WHEREFORE, for all the foregoing reasons, this Court should grant the *Motion for*

*Summary Judgment of Plaintiff Lawson on Complaint Objecting to Dischargeability of Debt.*

> Ann Pauly (*pro hac vice*)
> Griesinger, Tighe & Maffei LLP
> 176 Federal Street
> Boston, MA 02110
> Telephone: (617) 542-9900
> Facsimile: (617) 542-0900
> *apauly@gtmllp.com*
>
> By:     /s/Ann Pauly
>         Ann Pauly
>
>
> TARTER KRINSKY & DROGIN LLP
> 1350 Broadway
> New York, NY 10018
> (212) 216-8000
> Scott S. Markowitz
>
> Attorneys for Charles Lawson, Trustee of Trust
> 55547-90, Trust 12572-90 and Trust 9932-90

Dated: March 14, 2012