UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| ANDREW D. JUBELT, | : | Case No. 09-15435 (SMB) |
| | : | |
| Debtor. | : | |

---------------------------------------------------X

| | | |
|---|---|---|
| CHARLES R. LAWSON, as | : | |
| TRUSTEE OF TRUST 55547-90, | : | |
| TRUST 12572-90 and TRUST 9932-90, | : | Adv. Proc. No.09-01498 |
| | : | |
| Plaintiff, | : | |
| | : | |
| – against – | : | |
| | : | |
| ANDREW D. JUBELT, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------X

**MEMORANDUM DECISION GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**A P P E A R A N C E S :**

GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, MA 02110

       Ann Pauly, Esq.
          Of Counsel

       – and –

TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, NY 10018

       Scott S. Markowitz, Esq.
          Of Counsel

*Counsel for Charles R. Lawson*

DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue
New York, NY 10158

Ralph E. Preite, Esq.
Of Counsel

*Attorneys for Andrew D. Jubelt*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The plaintiff, Charles Lawson, suing in his capacity as Trustee of Trust 55547-90,

Trust 12572-90 and Trust 9932-90 (collectively, "Lawson" or the "Trusts"), commenced

this adversary proceeding seeking a determination that an approximate $4 million

judgment the Trusts recovered against the debtor, Andrew D. Jubelt, in a Massachusetts

state court proceeding is not dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and

523(a)(4). The Trusts have moved for summary judgment arguing that the Massachusetts

court's findings and conclusions are entitled to collateral estoppel effect and establish the

elements of the non-dischargeability claims. Jubelt contends that collateral estoppel does

not apply, and a trial is necessary to resolve disputed issues of material fact.

For the reasons that follow, the Trusts are granted summary judgment with

respect to their claim under 11 U.S.C. § 523(a)(2)(A), and the Court declines to reach the

issue of whether the Trusts' judgment is also non-dischargeable under 11 U.S.C. §

523(a)(4).

## BACKGROUND

The facts are derived from the Lawson's uncontroverted statement of material

facts.[1] (*See Plaintiff's Statement of Material Undisputed Facts as to Which There is No Genuine*

*Issue to be Tried*, dated Mar. 14, 2012 ("*Lawson's 7056-1 Statement*"), annexed as Exhibit A to

---

[1] As explained in greater detail later on, the facts set forth in *Lawson's 7056-1 Statement* are deemed to be established.

the *Motion of Plaintiff Lawson for Summary Judgment on Complaint Objecting to Dischargeability of Debt*, dated Mar. 14, 2012 (ECF Doc. # 8).)  The citations to the latter consist of parenthetical references to the appropriate paragraphs.

### A.  The Transaction Giving Rise to the Claim

The events underlying this matter date back over two decades.   On or about May 16, 1990, Jubelt, acting through an affiliate, Patrick Henry Hotel Investment Associates ("PHHIA"),[2] acquired the Patrick Henry Hotel (the "Hotel") from the Monterey Corporation ("Monterey") for $3.2 million.  (¶¶ 55, 59.)   PHHIA delivered a $1.1 million purchase money note to Monterey, assumed a first mortgage in the principal amount of $1.6 million held by Dominion Bank, N.A., and paid the balance of the purchase price in cash.  (¶¶ 60-62.)  In December 1990, PHHIA transferred ownership of the Hotel to Patrick Henry Hotel Associates, L.P. ("PHHA"), (¶¶ 45, 64), a Delaware limited partnership in which Jubelt and PHHIA were the general partners.  (*Memorandum of Decision and Order for Judgment*, dated Aug. 27, 2010 ("*MA Decision*") at ¶¶ 4, 5, annexed as Exhibit L to the *Affidavit of Ann Pauly, Esq. in Support of Plaintiff's Motion for Summary Judgment*, dated Mar. 13, 2012 ("*Pauly Affidavit*") (ECF Doc. # 10).)

PHHA failed to make timely payments on the note and mortgage.  (¶ 65.)  In an effort to prevent foreclosure proceedings against the Hotel, in early 1993, PHHA sought additional financing from Union Bank of Switzerland ("UBS") and a $2.5 million letter of credit (the "LC") from Republic National Bank of New York, now known as HSBC

---

[2]       During the relevant times, Jubelt was the president, a director, and a seventy-five percent shareholder of Affirmative Equities, Inc. ("AEI"), a New York corporation; AEI, in turn, was the general partner and fifty-five percent limited partnership interest holder of Affirmative Equities Company, L.P. ("AEC"), a Delaware limited partnership; AEC, in turn, was the sole shareholder of Patrick Henry Hotel Investors, Inc. ("PHHI"), and Jubelt was the president and director of PHHI.  Finally, PHHI was the managing partner of PHHIA, a New York partnership that owned the Hotel.  (¶¶ 42-49.)

Bank USA ("HSBC"), to secure the UBS loan.  (¶ 66.)  As a condition to issuing the LC,

HSBC insisted on a secured guarantee from an unaffiliated person.  (¶ 67.)

Jubelt contacted Lawson to propose that the Trusts provide the guarantee and

pledge their assets to secure the LC in exchange for a fee.  (¶ 68.)  He painted a rosy

picture of a short term accommodation with minimal risk.  To induce the Trusts to

provide the secured guaranty, Jubelt made the following representations to Lawson:

> (1)     The proceeds of the UBS loan would be used to pay for extensive
> renovations and improvements to the Hotel.  (¶ 70.)
>
> (2)     PHHA intended to refinance the UBS loan within a few months
> and repay the obligations underlying the guarantees and the LC.  (*See* ¶¶
> 72-73.)
>
> (3)     The risk to the Trusts was minimal, and Jubelt, AEC and AEI
> would each provide Lawson and the Trusts with guarantees for the
> payment of any and all sums drawn under the LC to protect the Trusts
> against any loss. (*See* ¶¶ 74, 76.)

Contrary to these representations, (1) Jubelt knew that the proceeds of the UBS

loan would not be used to renovate and improve the Hotel, but instead, would be used to

pay pre-existing debt to avoid foreclosure and to make substantial distributions to the

limited partners of PHHA (¶¶ 70, 75); (2) he concealed that he had no intention of using

the Hotel to secure the LC or the Trusts' obligations under the guarantees to HSBC (¶

71); (3) he concealed that there was no likelihood that PHHA would refinance the

financial obligations underlying the LC in the following months or even years (¶ 72); (4)

he concealed that he had no intention of repaying the LC until a sale of the Hotel, and

none was likely or planned in the near future (¶ 73); (5) he concealed that there was a

high risk of substantial loss to the Trusts (¶ 74); and (6) he concealed that Monterey had

already threatened to foreclose on the Hotel (¶ 75), and AEC and AEI and their affiliates

did not have sufficient cash or liquid assets to satisfy their financial obligations to the Trusts.  (¶ 78.)

PHHA and PHHI sent a letter to Lawson, dated July 13, 1993, confirming, *inter alia*, their agreement (1) to pay each of the Trusts the sum of $6,000 upon issuance of the LC; (2) to use their best efforts to replace the financing underlying the LC within six weeks; (3) to pay each Trust $25,000 upon the funding of the refinancing; and (4) in the event that the refinancing was not completed on or before August 31, 1993, to pay each Trust $2,000 on the first day of each month thereafter until the refinancing was completed (the "July 13, 1993 Letter").[3]  (¶ 79.)  Lawson agreed to provide the guarantees, and on July 13, 1994,[4] executed a Guaranty and Security Agreement on behalf of each of the Trusts in favor of Republic National Bank of New York for the benefit of PHHA (the "Guarantees").[5]  (¶¶ 81, 82.)

At or shortly after the closing on the UBS loan and the LC, Jubelt used the proceeds to satisfy the note to Monterey and a personal loan from a friend; he also distributed monies to himself, AEC and its affiliates, Lawrence Bishop (a director of AEI), Bishop's friends and others.  (¶ 83.)  Ultimately, PHHA and its affiliates failed to satisfy their payment obligations to the Trusts or repay the UBS loan.  In July 1997, HSBC repaid the funds due under the UBS loan and converted the LC into a demand note

---

[3]    A copy of the July 13, 1993 Letter is annexed as Exhibit A to Third Amended and Supplemental Complaint, dated June 15, 2006 ("*MA Complaint*"), which in turn is annexed as Exhibit E to the *Pauly Affidavit*.

[4]    The parties did not address the one year gap between the execution of the July 13, 1993 Letter and the delivery of the Guarantees.  Furthermore, the Massachusetts court did not mention it or deem it material to the outcome.

[5]    Copies of the Guarantees, which are all dated July 13, 1994, are annexed as Exhibit B to the *MA Complaint*.

in the amount of $2.5 million.  (¶ 94.)  On February 16, 2006, HSBC exercised its rights

under the Guarantees and withdrew $2,506,661.81 from the Trusts' accounts.  (¶ 149.)

### B.  State Court Proceedings

In October 2002, Lawson commenced an action in the Massachusetts Superior

Court against Jubelt, Bishop, John Hrvatin,[6] AEI, AEC, PHHA and PHHIA, seeking,

*inter alia*, redress for Jubelt's fraudulent misconduct and breach of fiduciary duty.  (¶ 1;

*see MA Complaint* at ¶ 1.)  Jubelt and his co-defendants (other than Bishop) filed a joint

answer on or about September 25, 2006.  (¶ 4; *Pauly Affidavit*, Ex. F (Answer to Third

Amended and Supplemental Complaint).)  The parties conducted extensive discovery,

including document requests, interrogatories, requests for admission and depositions.  (¶

5.)

During discovery, a dispute arose over the adequacy of responses to certain

interrogatories directed at AEC, but largely focused on obtaining evidence supporting

Jubelt's personal liability.  As a result, Lawson filed a motion to compel AEC to provide

full and complete answers.  (¶ 6.)  By order dated November 2, 2006, the Massachusetts

court granted Lawson's motion to compel, and provided Jubelt with six weeks to

supplement the disputed interrogatory responses.  (¶ 7.)

Jubelt's supplemental responses were still deficient.  (¶ 8.)  Consequently,

Lawson filed a motion to impose sanctions on AEC, Hrvatin and Jubelt for abusing the

discovery process and violating the Massachusetts court's order.  (¶¶ 9, 10; *see Pauly*

---

[6]    John Hrvatin ("Hrvatin") was an employee and Chief Financial Officer of AEC, the Vice
President of AEI, an officer and director of Patrick Henry Hotel Investors, Inc., and an officer of PHHIA.
(¶ 54.)

*Affidavit*, Ex. G (Lawson's Motion to Impose Sanctions).)   After a hearing, the

Massachusetts court issued an order, dated May 15, 2007, that struck their denial of those

paragraphs in the *MA Complaint* that corresponded to the disputed interrogatories and

ordered that those paragraphs were deemed admitted (the "Sanctions Order").  (¶¶ 11, 12;

*Pauly Affidavit*, Ex. H (Sanctions Order).)  Jubelt filed a motion for reconsideration of the

Sanctions Order, which was denied on November 27, 2007, (¶¶ 14, 15), and a petition for

interlocutory relief with the Massachusetts Appeals Court, which was also denied on

January 10, 2008.  (¶ 16.)

     The parties continued to prosecute the Massachusetts lawsuit and a trial was

scheduled for January of 2009.  (¶¶ 17, 20.)  However, in late 2008, the non-individual

defendants filed bankruptcy petitions in this Court, and on May 1, 2009, Jubelt filed a

personal bankruptcy petition in the Eastern District of Pennsylvania.  His case was

subsequently transferred to this Court on August 11, 2009.  On November 2, 2009, this

Court granted Lawson's motion for relief from the automatic stay to continue the

Massachusetts lawsuit against Jubelt.  (¶¶ 26-29.)

     The trial in the Massachusetts lawsuit against Jubelt and Hrvatin was rescheduled

for February 22, 2010.  (¶ 30.)  At a final pre-trial conference, the state court addressed

and decided motions in limine, objections to proposed exhibits, deposition testimony

designation by the parties and other procedural matters.  (¶ 31.)   The court and the

parties also discussed the meaning and consequence of the Sanctions Order on the trial.

(*Id.*)  The next day, the court held a conference with the parties and ruled that the

Sanctions Order rendered a trial unnecessary, cancelled the February 22, 2010 trial date

and established a schedule for the parties to submit proposed findings of fact and conclusions of law (the "Procedural Ruling").  (¶ 32.)

Lawson filed his submission on or about February 22, 2010, (¶ 33; *Pauly Affidavit*, Ex. I (Lawson's Proposed Findings), and Jubelt submitted his proposed findings of fact and conclusions of law on March 2, 2010.  (¶ 33; *Pauly Affidavit*, Ex. J (Jubelt's Proposed Findings).)  Jubelt limited his proposed findings to admissions only— that is, to those allegations admitted in his Answer, admitted in response to requests for admission, and deemed admitted as a result of the Sanction Order.  Notably, his submission acknowledged that the Sanctions Order supported findings that he had made the following misrepresentations to Lawson: (1) the LC and Guarantees would be in force for only a few months, (2) the financial obligations underlying the LC and Guarantees would be refinanced within a few months, (3) the Trusts' obligations arising under the Guarantees and LC would be secured by the Hotel and the assets and projects of AEC and its affiliates, (4) AEC had sufficient financial assets to satisfy the obligations under the LC, (5) PHHA would maintain an escrow account at HSBC with a balance sufficient to pay three months of interest due to HSBC, (6) there was no risk and no potential for any loss to the Trusts in providing the Guarantees, (7) the funds from the underlying UBS Loan would be used to pay for extensive renovations and improvements to the Hotel when, in fact, they would be used to repay the existing debt on the Hotel and make a substantial distribution to the limited partners of PHHA, and (8) the Trusts would be protected from any loss through guarantees to be provided by AEI, AEC and Jubelt when they knew, but concealed, that AEC, AEI and their affiliates did not have available cash or liquid assets to satisfy their obligations under the guarantee to the Trusts. (*Pauly*

8

*Affidavit*, Ex. J, at ¶¶ 18-21.)  In addition, Jubelt's proposed findings conceded that by

virtue of the Sanctions Order, the Trusts had met their burden of proving intentional fraud

and were entitled to a judgment under Count Two (fraud and misrepresentation) of the

*MA Complaint* in the sum of $4,083,090.00, plus interest.  (*Id.* at pp. 27-28.)

On August 27, 2010, the Massachusetts court issued the *MA Decision* and on

November 2, 2010, separately entered a final judgment against Jubelt and Hrvatin in the

sum of $4,083,090.00, plus interest.  (*See* ¶ 37; *Final Judgment on Claims Against*

*Defendants Andrew D. Jubelt and John Hrvatin*, dated November 2, 2010 ("*MA*

*Judgment*"), annexed as Exhibit L to the *Pauly Affidavit*.)  The Massachusetts Court

acceded to Jubelt's request and issued findings of fact based solely on the admissions,

except for one citation to a court order.  (¶ 37; *see MA Decision*, preamble paragraph and

¶ 67.)  Among other things, the *MA Decision* made the fraud-based findings and

conclusions supported by the Sanctions Order and consistent with Jubelt's own proposed

findings and conclusions, and judgment was entered against Jubelt, *inter alia*, on Count

Two, the intentional fraud count.  Jubelt filed a notice of appeal from the *MA Judgment*,

but did not pursue the appeal.  (¶¶ 39, 40.)  The Massachusetts Appeals Court granted

Jubelt several extensions of time, but finally dismissed his appeal for failure to prosecute,

making the *MA Judgment* final and non-appealable.  (¶¶ 40, 41.)

### C.  The Motion

Lawson commenced this adversary proceeding prior to the Massachusetts trial on

September 25, 2009, seeking a determination that the *MA Judgment* is excepted from

discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[7]  (*See Memorandum in

Support of Motion of Plaintiff Lawson for Summary Judgment on Complaint Objecting to

Dischargeability of Debt*, dated Mar. 14, 2012 ("*Motion*"), at 2 (ECF Doc. # 9).)  In a

nutshell, Lawson contends that Jubelt is collaterally estopped from relitigating issues that

were adjudicated in the Massachusetts lawsuit.  (*Id.* at 26.)  Consequently, he is entitled

to judgment as a matter of law in this action because the *MA Decision* is sufficient to

support a non-dischargeability determination under the Bankruptcy Code.  (*Id.* at 29-30.)

Jubelt has not disputed that the elements of § 523(a)(2)(A) are satisfied based on

the findings in the *MA Decision*,[8] though he does maintain it does not support a §

523(a)(4) claim.  (*See Defendant's Memorandum of Law in Opposition to Motion for

Summary Judgment*, dated Apr. 16, 2012 ("*Opposition*"), at 17-18 (ECF Doc. # 24).)  In

the main, however, Jubelt contends the *MA Decision* is not entitled to preclusive effect in

this action because the issues were not "actually litigated," and the issuance of the

---

[7]       11 U.S.C. 523(a) provides, in relevant part:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not
discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the
extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a
statement respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
larceny; . . . .

[8]       Although the Debtor disputes his vicariously liability for the acts of others, (*see Defendant's
Supplemental Memorandum of Law in Opposition to Summary Judgment and Addressing Vicarious
Liability and Fiduciary Liability*, dated May 25, 2012, at 4 (ECF Doc. # 23)), he does not contend or
explain why the fraud-related findings in the *MA Decision* as to him fail to establish Lawson's §
523(a)(2)(A) claim.

Sanctions Order and subsequent cancellation of the trial under the Procedural Ruling

deprived him of a full and fair opportunity to defend the claims against him.  (*Id.* at 2-3.)

## DISCUSSION

### A.  The Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions.  "The court

shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to a judgment as a matter of law."  FED. R.

CIV. P. 56(a).[9]  The moving party bears the initial burden of showing that the undisputed

facts entitle him to judgment as a matter of law.  *Rodriguez v. City of New York*, 72 F.3d

1051, 1060-61 (2d Cir. 1995).  If the movant carries this initial burden, the nonmoving

party must set forth specific facts that show triable issues, and cannot rely on pleadings

containing mere allegations or denials.  *See* FED. R. CIV. P. 56(e);  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986).  In deciding whether material factual issues exist, all

ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving

party.  *Matsushita*, 475 U.S. at 587.

Rule 7056-1(b) of the Local Bankruptcy Rules for the Southern District of New

York requires the party moving for summary judgment to submit "a separate, short and

concise statement, in numbered paragraphs" setting forth material facts as to which there

---

[9]     The Motion is governed by the amendments to Rule 56 that became effective on December 1,
2010. Although some language has changed, the standard for granting summary judgment remains
unchanged and the amendments will not "affect continuing development of the decisional law construing
and applying these phrases." FED. R. CIV. P. 56 advisory committee's note (2010).

is no genuine issue to be tried. BANKR. S.D.N.Y.R. 7056-1(b). A party opposing

summary judgment must submit a correspondingly numbered statement of facts

responding to each of the movant's factual allegations, and may submit, in separate

paragraphs, additional material facts as to which genuine triable issues remain. BANKR.

S.D.N.Y.R. 7056-1(c). Each statement by the movant or opponent must be "followed by

citation to evidence which would be admissible." BANKR. S.D.N.Y.R. 7056-1(e). The

facts set forth in the movant's statement are "deemed admitted . . . unless specifically

controverted by a correspondingly numbered paragraph" in the opponent's counter-

statement. BANKR. S.D.N.Y.R. 7056-1(d).

Lawson's 7056-1 Statement includes citations to admissible evidence after each

statement. The burden then fell on Jubelt to submit a counter 7056-1 fact statement

specifically controverting any disputed assertions in Lawson's 7056-1 Statement, but he

failed to do so. Accordingly, the facts set forth in Lawson's 7056-1 Statement are

deemed admitted, and the Court may grant summary judgment on the basis of

uncontested assertions in the moving party's 7056-1 Fact Statement. See Holtz v.

Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001); Millus v. D'Angelo, 224 F.3d 137, 138

(2d Cir. 2000); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998).

### B.  Collateral Estoppel

The doctrine of collateral estoppel, also known as issue preclusion, applies in

dischargeability proceedings under 11 U.S.C. § 523(a). Grogan v. Garner, 498 U.S. 279,

285 n.11 (1991). A federal court is required to give a state court judgment the same

preclusive effect as would a sister court of the judgment state.  28 U.S.C. § 1738;[10] *see,*

*e.g.*, *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (section

1738 requires federal courts to "refer to the preclusion law of the State in which judgment

was rendered"); *Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("Congress has specifically

required all federal courts to give preclusive effect to state-court judgments whenever the

courts of the State from which the judgments emerged would so."); *New York v. Sokol (In*

*re Sokol)*, 113 F.3d 303, 306 (2d Cir. 1997) ("[T]he preclusive effect of a state court

determination in a subsequent federal action is determined by the rules of the state where

the prior action occurred . . . .").  This Court must, therefore, look to the law of the

Commonwealth of Massachusetts to determine whether the Massachusetts courts would

preclude Jubelt from contesting facts material to Lawson's dischargeability claims.

Under Massachusetts law, "'[w]hen an issue of fact or law is actually litigated and

determined by a valid and final judgment, and the determination is essential to the

judgment, the determination is conclusive in a subsequent action between the parties,

whether on the same or a different claim.'"  *Alba v. Raytheon Co.*, 809 N.E.2d 516, 521

(Mass. 2004) (quoting *Martin v. Ring*, 514 N.E.2d 663, 664 (Mass. 1987)); *accord Bingo*

*Innovative Software, LLC v. Cahill*, No. SUCV2010-02734-A, 2011 WL 2652170, at *4

(Mass. Super. 2011); *see Smith Barney, Inc. v. Strangie (In re Strangie)*, 192 F.3d 192,

194 (1st Cir. 1999) (Massachusetts law of collateral estoppel "precludes relitigation of

issues determined in prior actions between the parties or those in privity with those

---

[10]    Section 1738 provides in pertinent part:

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall
have the same full faith and credit in every court within the United States and its
Territories and Possessions as they have by law or usage in the courts of such State,
Territory or Possession from which they are taken.

parties, provided the issues were actually litigated in the first action, and determined by a

final judgment on the merits").  Thus, four elements must be present for collateral

estoppel to apply:

> (1) there was a valid and final judgment on the merits in [a] prior
> adjudication; (2) the party against whom estoppel is asserted was a party
> (or in privity with a party) to the prior adjudication; (3) the issue in the
> prior adjudication is identical to the issue in the current litigation; and (4)
> the issue decided in the prior adjudication was essential to the earlier
> judgment.

*Okoli v. Okoli*, 963 N.E.2d 737, 742 (Mass. 2012) (quoting *Porio v. Department of Rev.*,

951 N.E.2d 714, 718 (Mass. 2011)).  "[T]he 'guiding principle' in determining whether to

allow a party to use collateral estoppel is whether the party against whom it is asserted

had a 'full and fair opportunity to litigate the issue in the first action or [whether] other

circumstances justify affording him an opportunity to relitigate the issue.'" *Treglia v.

MacDonald*, 717 N.E.2d 249, 253 (Mass. 1999) (quoting *Martin*, 514 N.E.2d at 664).  In

the end, the "aim of the doctrine of collateral estoppel is to conserve judicial resources, to

prevent the unnecessary costs associated with multiple litigation, and to ensure the

finality of judgments."  *Id.* (internal quotation marks omitted).

Three of the four elements of collateral estoppel under Massachusetts law require

only brief comment.  Jubelt was a party to the Massachusetts lawsuit (second element).

A finding of fraud under the common law of Massachusetts satisfies the elements for

fraud under 11 U.S.C § 523(a)(2)(A) (third element).  *Unger v. Lambert (In re Lambert)*,

459 B.R. 519, 525 (Bankr. D. Mass. 2011); *see Field v. Mans*, 516 U.S.  59, 70 n.9

(1995) ("We construe the terms in § 523(a)(2)(A) to incorporate the general common law

of torts, the dominant consensus of common-law jurisdictions, rather than the law of any

particular state."); *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) ("The elements of

actual fraud under Bankruptcy Code incorporate the general common law of torts and

likewise include a false representation, *scienter*, reliance, and harm.").  Finally, the *MA*

*Judgment* was entered in favor of the Lawson on all the claims alleged in his complaint,

including Count Two, which was based on fraud and misrepresentation (fourth element).

The issue that separates the parties is whether the *MA Judgment* was on the

merits, *i.e.*, "actually litigated."  Jubelt contends that the issues were not "actually

litigated" because the Massachusetts court never held a trial.  Furthermore, he contends

that the line of cases that grant preclusive effect to default judgments under an exception

to the general rule discussed below are distinguishable because the Massachusetts court

did not enter a default judgment; instead, it based the *MA Decision* on the Sanctions

Order.  Jubelt's argument, however, misconstrues the relevant case law regarding the

preclusive effect of default judgments.

The starting point for the analysis is the Massachusetts Supreme Judicial Court's

decision in *Treglia*.  There, the Treglias sued MacDonald in Massachusetts Superior

Court alleging breach of contract and fraud in connection with an extension of credit.

*Treglia*, 717 N.E.2d at 251.  The Treglias obtained an attachment order that MacDonald

twice moved to vacate or discharge.  Neither MacDonald nor his counsel participated in

any other aspect of the lawsuit and MacDonald failed to answer the complaint.  *Id.*  A

default was entered, and following an inquest in which MacDonald did not participate,

the state court entered a judgment in favor of the Treglias in the sum of $94,365.15.  *Id.*

MacDonald subsequently filed a chapter 7 petition, and the Treglias filed an

adversary proceeding seeking a declaration that the state court judgment was excepted

from discharge under 11 U.S.C. § 523(a)(2)(A).  The bankruptcy court rejected the

Treglias' contention that under the Massachusetts law of collateral estoppel they were

entitled to judgment as a matter of law and, ultimately, ruled against them on the merits.

*Id.*  The Treglias appealed to the First Circuit Bankruptcy Appellate Panel which certified

the following question to Massachusetts's highest court:

> When a defendant appears in a civil action, files a motion seeking
> interlocutory relief, obtains that relief, but does not thereafter answer or
> defend; and when, after a damage hearing (in which the defendant does
> not participate), default judgment enters; does Massachusetts law preclude
> the defendant's litigation of the substantive elements underlying the
> default judgment in a subsequent action initiated by the same plaintiffs?

*Id.* at 250-51.

Answering the question in the negative, the *Treglia* Court reaffirmed the rule that

"preclusive effect should not be given to issues or claims that were not *actually litigated*

in a prior action," and recognized that "generally in the case of a judgment entered by

default, none of the issues is actually litigated or decided."  *Id.* at 253 (citing

Restatement (Second) of Judgments, at § 27 cmt. e, at 256-57) (emphasis added).

Accordingly, the Court found that the default judgment in *Treglia* did not have preclusive

effect because the debtor did not attempt to defend himself in the prior lawsuit, the record

did not reflect that any of the issues were "fully litigated," and the state court "received

no evidence and made no findings of fact or conclusions of law" as to liability.  *Id.* at

253-54.

In dicta, the *Treglia* Court identified an exception to this rule:

> [E]ven in the case of a judgment entered by default, there may be some
> circumstances in which an issue may be given preclusive effect in
> subsequent litigation between the same parties.  We can, for example,
> envision circumstances in which a litigant may so utilize our court system

in pretrial procedures, but nonetheless be defaulted for some reason, that
the principle and rationale behind collateral estoppel would apply.

*Id.* at 254.  The Massachusetts court cited two Federal Circuit Court decisions–*Bush v.*

*Balfour Beatty Bahamas, Ltd. (In re Bush)*, 62 F.3d 1319 (11th Cir. 1995) and *Gober v.*

*Terra + Corp. (In re Gober)*, 100 F.3d 1195 (5th Cir. 1996)–that illustrated this

exception.

In *Bush*, a default judgment was entered against Bush on the plaintiff's fraud

claim as a sanction for his failure to produce trial exhibits, appear for depositions and

attend a pre-trial conference.  62 F.3d at 1321-22.  Bush subsequently filed a bankruptcy

case, and his judgment creditor filed an adversary proceeding to determine the

dischargeability of the judgment.  The judgment creditor moved for summary judgment

arguing that the default judgment was preclusive, and Bush responded that the issue of

fraud was not actually litigated in the prior action.  *Id.* at 1322.

The Eleventh Circuit Court of Appeals affirmed the bankruptcy court's decision

to grant preclusive effect to the default judgment and held that the debt was non-

dischargeable under 11 U.S.C. § 523(a)(2)(A):

> Where a party has substantially participated in an action in which he had a
> full and fair opportunity to defend on the merits, but subsequently chooses
> not to do so, and even attempts to frustrate the effort to bring the action to
> judgment, it is not an abuse of discretion for a district court to apply the
> doctrine of collateral estoppel to prevent further litigation of the issues
> resolved by the default judgment in the prior action.  Bush had ample
> warning from the prior court and could reasonably have foreseen the
> conclusive effect of his actions.

*Id.* at 1325.  Moreover, the *Bush* Court noted that "[j]ust as due process is not offended

by the entry of a default judgment against a party for failure to cooperate with discovery,"

*id.* (citing *Societe Internationale Pour Participations Industreilles et Commerciales, S.A.*

*v. Rogers*, 357 U.S. 197, 209-10 (1958)), "neither is due process offended if a debtor is

held to the consequences of that judgment in a subsequent bankruptcy discharge

proceeding." *Id.* (citing *Blonder-Tongue Lab. Inc. v. Univ. of Illinois Found.*, 402 U.S.

3123, 328-29 (1971)).

In *Gober*, the Fifth Circuit Court of Appeals reached the same result on similar

facts.  There, the plaintiff sued Gober alleging that he had converted loan proceeds and

client funds.  Gober filed an answer and the parties actively litigated the action for two

years.  *Gober*, 11 F.3d at 1199-1200.  The state court subsequently directed Gober to post

a $1,500 deposit on account of discovery abuses and to respond to the plaintiff's

discovery requests.  Gober failed to post the security or respond to the discovery, and the

plaintiff moved to dismiss his counterclaims and strike his answer.  *Id.* at 1200.  Gober

failed to appear on the return date of the motion and specifically directed his attorney not

to appear on his behalf.  In his absence, the state court struck his answer, entered the

default judgment against him, dismissed his counterclaims, and made factual findings

that Gober had embezzled roughly $300,000 from the plaintiff and had acted with

fraudulent intent, and willfully and maliciously.  *Id.* at 1200.

Gober thereafter filed a voluntary chapter 7 petition, and his judgment creditor

filed a complaint objecting to the discharge of the judgment under 11 U.S.C. §§

523(a)(2), (4), and (6).  The judgment creditor moved for summary judgment contending

that collateral estoppel barred Gober from relitigating the factual and legal issues

necessary for holding the judgment debt non-dischargeable.  *Id.*  Gober cross-moved for

summary judgment.  The bankruptcy court granted the judgment creditor's motion and

denied the cross-motion, and the district court affirmed.  *Id.*

The Fifth Circuit framed the question before it as "whether a state court default judgment entered as a sanction for discovery abuse is entitled to issue preclusive effect in a subsequent bankruptcy proceeding to determine the dischargeability of the judgment debt." *Id.* at 1199. Answering in the affirmative, the Court of Appeals held that Gober was precluded from relitigating issues resolved by the default judgment. *Id.* at 1205. The Court recognized that under Fifth Circuit law, ordinary no-answer default judgments were not given preclusive effect, whereas post-answer default judgments were considered actually litigated and were, therefore, accorded preclusive effect. "The rationale for the general rule denying preclusive effect to default judgments is that a party may choose not to litigate issues for reasons that have nothing to do with the merits of the case—for example, if the amount at stake does not justify the expense of contesting the lawsuit." *Id.*; *accord Treglia*, 717 N.E.2d at 254 n.7 (surmising that the debtor may have opted to default in the state court proceeding to "conserve both his own resources and judicial resources by a single proceeding in the bankruptcy court").

The Fifth Circuit observed that because the state court had struck Gober's answer and entered a default against him as a discovery sanction, the default was akin to a no-answer default judgment under Texas law since the defendant's liability was no longer at issue. *Id.* at 1204. The default judgment was nonetheless entitled to preclusive effect because Gober "did not simply give up at the outset, but actively participated in the litigation for two years, filing counterclaims and making discovery requests." *Id.* at 1205. "Furthermore, the [state] court struck Gober's pleadings only after Gober had repeatedly impeded the course of the proceedings by refusing to comply with discovery and by defying court orders." *Id.* at 1205-06. Finally, the Court noted that even though

19

Gober's liability was determined by virtue of the default, the state court made specific findings regarding Gober's conduct in deciding whether the plaintiff was entitled to punitive damages under Texas law.  *Id.* at 1205.

More recently, in *Backlund v. Stanley-Snow (In re Stanley-Snow)*, 405 B.R. 11 (1st. Cir. B.A.P. 2009), the First Circuit Bankruptcy Appellate Panel applied the exception highlighted in *Treglia* to a § 523(a) non-dischargeability proceeding, and upheld the bankruptcy court's application of collateral estoppel to a prior Massachusetts court judgment entered by default.  *Id.* at 14-15.  There, the plaintiffs had sued the debtor and other defendants in state court alleging, *inter alia*, fraud and misrepresentation as well as claims under Massachusetts's Consumer Protection Act.  *Id.* at 15.  After the parties conducted extensive discovery, the defendants failed to appear for the first day of trial despite their counsel's repeated attempts to contact them and the service of a trial subpoena by the plaintiffs requiring them to appear.  *Id.*  The state court entered a default against the defendants as to liability, and following an inquest before a jury at which the debtor appeared and testified, the jury returned a verdict in favor of the plaintiffs.  The state court subsequently entered a judgment in the approximate sum of $475,000, *id.*, and also made specific findings that the defendants had engaged in unfair and deceptive practices and had committed fraud.  *Id.* at 15-16.  As in *Bush* and *Gober*, the debtor filed a bankruptcy petition, the judgment creditor filed an adversary proceeding to determine the dischargeability of the judgment, and the bankruptcy court granted summary judgment on the plaintiffs' claim under 11 U.S.C. § 523(a)(2) based on the preclusive effect of the state court judgment.  *Id.* at 16-17.

On appeal, the Bankruptcy Appellate Panel extensively surveyed the law of

Massachusetts and other jurisdictions, and concluded that the majority of jurisdictions,

including Massachusetts, have adopted the rule that the "actually litigated" requirement

may be satisfied "if the party actively or substantially participated in the proceedings

prior to the entry of a default judgment." *Id.* at 19-20 & nn. 4 & 5; *see also Int'l

Strategies Group, Ltd. v. Pomeroy* (*In re Pomeroy*), 353 B.R. 371, 377 (Bankr. D. Mass.

2006).  The majority approach is based on the principle that "if a party was afforded a

reasonable opportunity to defend in the prior action but chose not to do so, the party

could have reasonably foreseen the consequences of not defending the action and it

would be 'undeserved' to give a 'second bite at the apple when he knowingly chose not

to defend himself in the first instance.'" *Id.* at 20 (quoting *Bush*, 62 F.3d at 1324).  The

Court reasoned that unlike a "typical default case" in which no answer is filed and "the

defendant's participation was on the periphery of the case,"  "the Debtor participated

extensively in the prior state court ligation for two years." *Id.*  She gave a deposition,

engaged in written discovery and filed papers with the court.  She failed to appear at the

trial on the merits and offered no explanation for her absence.  Finally, she appeared and

testified at the inquest, and the state court made detailed findings of fact regarding the

debtor's conduct and the credibility of her testimony. *Id.*  Thus, the circumstances

contemplated in *Treglia* were present, *id.*, and the "actually litigated" element of

collateral estoppel was satisfied. *Id.* at 20-21.

*Bush*, *Gober* and *Stanley-Snow* are indistinguishable from Jubelt's situation and

the issues presented by this adversary proceeding.  The Massachusetts lawsuit involved

serious charges and large potential damages, and Jubelt actively defended his interests,

substantially participating in the Massachusetts litigation for several years.  He answered,

and engaged in pre-trial discovery and motion practice regarding his failure to comply

with discovery.  The Massachusetts court struck his answer as a discovery sanction, but

even then Jubelt continued to litigate.  He was ready to go to trial, and after the state court

decided that a trial was unnecessary, he submitted extensive proposed findings and

conclusions.  Finally, the Massachusetts court made specific and comprehensive findings,

confirmed by Jubelt's own view of the effect of the Sanctions Order as reflected in his

proposed findings and conclusions, that he had defrauded the Trusts out of more than $4

million.  Accordingly, the Court concludes that Jubelt "actually litigated" the fraud issue

in the Massachusetts lawsuit.

This conclusion necessarily rejects Jubelt's arguments against the application of

collateral estoppel.  His opposition boils down to three points:  (1) the post-default

collateral estoppel cases cited by the Plaintiff and discussed above are inapplicable to the

case at bar because the Debtor was not defaulted by the Massachusetts court [11]

(*Opposition* at 2); (2) the issue of fraud was not "actually litigated" in the Massachusetts

lawsuit; (*id.*); and (3) he did not have a full and fair opportunity to litigate the issues in

the Massachusetts lawsuit because of the "draconian" nature of the Sanctions Order, (*id.*

at 3, 13), and the unfair deprivation of his day in court resulting from the Procedural

---

[11]    In a footnote, Jubelt argues that if the Sanctions Order is likened to a default, it should be treated
as a pre-answer default (which is less likely to be afforded preclusive effect) since his denials were stricken
from his answer, as opposed to a post-answer default (for which collateral estoppel is more likely to apply).
(*See Opposition* at 12 n.1.)  State law must determine the effect of a state court's sanction order.  Jubelt
does not discuss Massachusetts law or cite any authority to support the proposition that the Sanctions
Order left him in the same position as if he had not filed an answer at all.  Moreover, in *Gober*, the Court
concluded under Texas law that even though the default against Gober left him as if he had never filed an
answer, the judgment had preclusive effect because, like Jubelt, Gober actively participated in the lawsuit,
and like the Massachusetts court, the Texas state court made specific findings regarding his conduct.  *See
Gober*, 100 F.3d at 1204-07.

Ruling. (*Id.* at 12, 14.)  He attempts to distinguish the *Stanley-Snow*, *Gober* and *Bush*
cases saying that each of those defendants chose to abandon their defense or cause default
judgments to be entered against them, but he "never abandoned his effort to defend." (*Id.*
at 11, 14.)

Jubelt's view of what occurred in state court is skewed.  The Sanctions Order had
the same effect as a default judgment:  it struck the material parts of his answer and
established the corresponding facts.  The application of collateral estoppel is plainly more
compelling here than it would be had the Massachusetts court struck the entire answer
and entered a default judgment as the sanction.  Moreover, Jubelt substantially
participated in the Massachusetts litigation, and lost his opportunity to put the Trusts to
their proof when he effectively abandoned his case.  He had the choice to comply with
Lawson's discovery requests and avoid the Sanctions Order.  Instead, he flouted the
Massachusetts court's orders and ignored the obvious consequences, creating the
predicament that sealed his fate.  In addition, the Massachusetts court made detailed
findings regarding Jubelt's fraudulent conduct.  Finally, the correctness and fairness of
the Sanctions Order or the Procedural Ruling are not issues properly raised before this
Court.  I do not sit as an appellate court to review the orders of the Massachusetts court,
*see District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983); *Rooker
v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923), and Jubelt must pursue his remedies in
the state court system.  At bottom, Jubelt "so utilize[d] [the Massachusetts] court system
in pretrial procedures, . . . that the principle and rationale behind collateral estoppel
would apply." *Treglia*, 717 N.E.2d at 254.

In conclusion, Lawson's motion for summary judgment is granted with respect to his § 523(a)(2)(A) claim, and it is unnecessary to reach his claim under § 523(a)(4). The Court has considered Jubelt's other arguments that are not specifically addressed above, and concludes that they lack merit. Submit judgment.

Dated: New York, New York
      October 3, 2012

               /s/ *Stuart M. Bernstein*
               STUART M. BERNSTEIN
          United States Bankruptcy Judge